T.C. Memo. 2000-193


UNITED STATES TAX COURT


ESTATE OF REBECCA A. WINEMAN, DECEASED,
ELEANOR TRUOCCHIO AND DEAN WINEMAN,
CO-EXECUTORS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 27339-96.                    Filed June 28, 2000.


    1.  Decedent (D) gave an aggregate 24-percent
interest in her homestead property to her children.  In
the years following the transfer, she continued to
reside on the property.  R determined that the 24-
percent interest is includable in D's gross estate
pursuant to sec. 2036, I.R.C.  <u>Held</u>:  D's continued use
of the homestead property as her residence following
the transfer of minority interests in the property to
her children was not a retained life estate in the
property interests conveyed to her children.
Consequently, the value of the minority interests is
not includable in her estate under sec. 2036, I.R.C.

    2.  D rented her interests in certain real estate
to Coastal Ranches, a corporation owned by her
children, at a below-market rent.  R determined that
the annual difference between fair market rent and
actual rent constituted taxable gifts.  <u>Held</u>:  R's
computation of the amount of taxable gifts sustained.

3.  On its Form 706, U.S. Estate (and Generation-Skipping Transfer) Tax Return, P valued D's real estate at $2,261,800.  R determined that the fair market value was $2,785,248.  <u>Held</u>:  The fair market value was $2,417,491.

4.  P elected special use valuation of certain farm real property on its Form 706.  R disallowed the election because P failed to document comparable rental property in accordance with sec. 2032A(e)(7), I.R.C., and the regulations thereunder.  See sec. 20.2032A-4, Estate Tax Regs.  <u>Held</u>: P may not value its elected properties under the valuation formula of sec. 2032A(e)(7), I.R.C.  <u>Held, further</u>, by reason of sec. 20.2032A-4, Estate Tax Regs. (which provides that if an executor does not identify comparable property and cash rentals as required by sec. 2032A(e)(7), I.R.C., all specially valued real property must be valued under the rules of sec. 2032A(e)(8), I.R.C.), P may value the properties under the provisions of sec. 2032A(e)(8), I.R.C.  <u>Held, further</u>, P's special use valuation under sec. 2032A(e)(8), I.R.C., is allowed.

<u>John W. Ambrecht</u> and <u>Gregory Arnold</u>, for petitioner.

<u>Steven M. Roth</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Respondent determined an estate tax deficiency of $775,626 and an addition to tax under section 6662 of $3,844.  After concessions,[1] the issues for decision are:

---

[1]The parties conceded several items in a stipulation of agreed adjustments, filed Sept. 14, 1998.  Petitioner's concessions are described therein and will not be repeated here.  Respondent has conceded that petitioner is not liable for the addition to tax.  On brief, respondent conceded that the fair market values of decedent's interests in two parcels of estate

(continued...)

1)  Whether Rebecca A. Wineman (decedent) retained a life estate in partial interests in her homestead property transferred to her children.  We hold that she did not.

2)  Whether decedent rented her ranch properties to a closely held corporation owned by her children at below-market-value rates, thereby making taxable gifts to her children.  We hold that she did.

3) Whether the cumulative fair market value of certain real property includable in the gross estate was $2,261,800 as returned by petitioner, $2,785,248 as determined by respondent, or some other figure.  We hold that the fair market value was $2,417,491.

4)  Whether petitioner's election of special use valuation qualified as a valid election under section 2032A.[2]  We hold that it did.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts is incorporated herein by this reference.

---

[1](...continued)
property, the Homestead (parcel 3) and the Machado Ranch (parcel 8), were $52,000 and $231,000, respectively.

[2]All section references are to the Internal Revenue Code as in effect for the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts have been rounded to the nearest dollar.

Rebecca A. Wineman (decedent) died on June 24, 1992 (the valuation date). Petitioner's coexecutors resided in Santa Maria, California, at the time the petition in this case was filed.

Ranch Operations

The Wineman family has been grazing cattle in the Nipomo, California, area for approximately 115 years. Decedent and her husband, Vernon Wineman (Mr. Wineman), were full-time cattle ranchers from the 1930's until their deaths.[3] Until early 1992, decedent performed numerous activities relating to the cattle operation. Her activities included feeding the cattle, deciding which breed to run, helping brand cattle, cooking for the branding crew, deciding when to buy and sell cattle and at what prices, making decisions regarding feed purchases, negotiating purchases of real estate and coordinating all the legal and sales activities for the purchases, arranging for Land Bank lending, painting and assisting in the repair and maintenance of corrals and cattle facilities, and attending bull and cattle sales in San Luis Obispo, Kern, and Santa Barbara Counties. Decedent also belonged to local and national cattle organizations.

Coastal Ranches, a C corporation organized in 1979, continues the cattle operations conducted by decedent and Mr.

---

[3]Mr. Wineman died on Jan. 22, 1962.

Wineman.  Decedent owned no interest in Coastal Ranches.
Decedent and Mr. Wineman's three children, Dean Wineman (Dean),
Eleanor Truocchio (Eleanor), and Marian Hanson (Marian), each own
21 percent of Coastal Ranches, and the remaining 37 percent is
owned by Mr. Wineman's testamentary trust (the trust), of which
the three children are beneficiaries.  Dean and Eleanor are full-
time cattle ranchers.  Marian lives in Montana and occasionally
participates in the cattle operation.

Nipomo Properties

The Nipomo properties (parcels 3, 5, 6, 9, and 10) are
located within the greater urban area of Santa Maria, a city at
the northern end of Santa Barbara County, California.  The Santa
Maria area has a population of approximately 100,000.  Santa
Maria is primarily a farming community.  Other parts of the
coastal zone are more upscale, such as the Santa Ynez and Santa
Ynez River Valleys to the south.  Arroyo Grande, to the north and
west of Santa Maria and along the Pacific coast, is the location
of many second homes, attracting people seeking to escape the
summer heat of the San Joaquin Valley.  Further north along the
coast, the coastal towns of Morro Bay and Cambria are also
popular with tourists.  The area has attracted resort and second
home development.

Although Santa Maria is within Santa Barbara County, the
town of Nipomo and the Nipomo properties are in San Luis Obispo

County. These properties are at the southern entrance to San Luis Obispo County. As of the valuation date, the county government intended to preserve this entrance as a scenic area that extended back almost to the first range of hills. Specifically, the San Luis Obispo County land use element in effect at the valuation date placed the ranches in the South County Planning Area. Permitted uses of properties in this area were limited to certain specified agricultural uses.

As of the valuation date, the Nipomo properties were part of an agricultural preserve and had been continuously since the early 1970's. A property is placed in an agricultural preserve by the land owner by a contract with the county. In exchange for keeping the property as rural, open space agricultural land, the land owner receives a preferential property tax rate. Each property in the agricultural preserve is encumbered by a 20-year evergreen contract, which renews day to day. Under the contract, a landowner has the right to notify the county of an intent to terminate the contract on its anniversary date, and once such notice is provided, the contract will expire 20 years later. The Winemans did not provide notice of intention to terminate the evergreen contracts on the Nipomo properties at any time before their deaths.

The Homestead Property

Decedent's homestead property (parcel 3) is the site of two residences. One is a larger house with three bedrooms. Decedent occupied one bedroom at the time of her death and had the use of the living room, kitchen, and dining area. Dean used a second bedroom as an office, where he kept his desk and all his bookkeeping papers, although he had moved out of the main house in 1979 or 1980 after his marriage. Decedent used the other bedroom as a guest bedroom, primarily for Marian when she visited from Montana. The main house also had a separate office that was the corporate headquarters for Coastal Ranches.

The second house on the homestead property is a smaller house of approximately 1,500 square feet. Dean has lived there since 1979 or 1980 as a ranch employee. He has never paid rent for his use of the smaller house.

In addition to the residences, parcel 3 has two large barns, a small barn, a granary, cattle scales and corrals, a farm shop, two garages, and a small orchard.

During each of the years 1968, 1969, and 1970, decedent gave each of her three children one-third of an undivided 8-percent interest in her homestead property, for a total gift to all three children after the 3-year period of 24 percent. At the time of her death, decedent owned a 51-percent interest in the homestead property. The trust owned the remaining 25 percent.

Coastal Ranches stored hay in the barns, used the corrals and farm shop, and kept vehicles in a garage and in one of the big barns. Coastal Ranches maintained and paid utilities for the houses. Coastal Ranches also sealed the driveway, installed a sidewalk, and provided decedent with a pickup truck for her use. Workers provided by Coastal Ranches assisted with yard maintenance, including cutting down and pruning trees, repairing water pipes, and removing bushes. Coastal Ranches was also responsible for replacing fences and corrals in the event of a fire.

Some of the soil on parcel 3 was contaminated by the spillage of gasoline in a refueling area near one of the barns. On February 9, 1996, NG Chemical estimated the soil remediation expenses on parcel 3 to be $36,256.

As of the valuation date, the fair market value of decedent's interest in the homestead property, including land, buildings, and site improvements, was $52,000.

The Nipomo Pasturelands

The Nipomo pasturelands consisted of Rancho El Suey (parcel 5), Rancho Nipomo (parcel 6), Lot 74 (parcel 9), and the Pit (parcel 10). As of the valuation date, all of these properties were vacant, unimproved lands used only for cattle grazing.

Decedent owned 51 percent of parcel 5, which was an oblong, irregularly shaped property consisting of 1,487 acres located on

the north side of Highway 166 between Temettate Ridge and Twitchell Reservoir.  On the valuation date, the property carried approximately 50 cows.

Decedent owned 50 percent of parcel 6, which was a squarish, 648-acre property situated immediately west of Temettate Ridge and parcel 5.  The easternmost corner of parcel 6 adjoined the westernmost corner of parcel 5, but the properties did not otherwise share a common boundary.  On the valuation date, the property carried 20-25 cows.

Decedent owned 100 percent of parcel 9, which was a rectangular parcel of 90 acres, situated directly northwest of parcel 6.  The longer side of the rectangle (the southeast boundary) was also the northwest boundary of parcel 6.  The record does not reflect parcel 9's carrying capacity as of the valuation date.

Decedent owned 100 percent of parcel 10, a triangular parcel created by the realignment of Highway 166, which severed Parcel 10 from other Wineman properties.  Parcel 10 is bisected by two ravines.  At 7 acres, it is below the minimum parcel size allowed by local zoning.  Thus, it would be valuable only to a neighboring landowner wishing to expand his acreage.

Average annual precipitation on the properties ranged from 14 to 18 inches.  With the exception of only a few acres, the soil composition and steep slopes made the properties unsuitable

for farming.  A variety of factors made these ranch properties unattractive for residential development, including limited water supplies and land use restrictions.  As of the valuation date, the highest and best use of these properties was their continued use as grazing land and pastureland.

As of the valuation date, the fair market values of decedent's interests in the Nipomo properties were as follows:

| Parcel no. | Parcel name | Fair market value |
|------------|-------------|-------------------|
| 5 | Rancho El Suey | $580,153 |
| 6 | Nipomo Ranch | 247,860 |
| 9 | Lot 74 | 81,000 |
| 10 | The Pit | 1,750 |

The Machado Ranch

Decedent owned a 25-percent interest in the Machado Ranch (parcel 8), which consisted of approximately 1,204 acres of unimproved grazing land located just behind the first ridge of the Santa Lucia Mountains, approximately 8 miles west of the city of San Luis Obispo.  Approximately 562 acres are steep, rocky, or brushy, which limits the grazing utility of the property.  The pasture quality is about average for the area.  The property is perimeter fenced.  However, the topography of the property makes the ranch difficult to manage.  Because of the steep slopes and brushy canyons throughout the property, livestock are difficult to round up, and extra labor is required to do so.  As of the

valuation date, the property carried 56 cows.  During 1998, it was carrying about 75 cows.

Parcel 8 is zoned for agricultural use, and the zoning is burdened with a "geologic hazard" overlay.  Like the Nipomo properties, Machado Ranch is in an agricultural preserve and is the subject of a 20-year evergreen contract.

The applicable land use laws permit rural residential use of the property.  However, the steep terrain, rough-graded access roadway, and third-party easement rights severely restrict the desirability for residential use.  The property is also situated in an area at risk for wildfires, and portions of the ranch were burned in fires during 1985 and 1994.  There are no developed utilities, and the ranch roads are usable only by four-wheel-drive vehicles.

As of the valuation date, the fair market value of decedent's interest in parcel 8 was $231,000.

Rental of Decedent's Ranch Properties

During 1989, 1990, and 1991, decedent leased her interests in the ranch properties to Coastal Ranches, pursuant to oral agreements.  Coastal Ranches paid decedent $5,000 per year during 1989 and 1990 and $10,000 per year during 1991 for the right to graze cattle on her ranch properties.  The rate of rent was not negotiated.  For these years, decedent informed her children what rent she intended to charge, and the children accepted that rent

without question. Decedent did not tell her children how she calculated the rent. In 1989, 1990, and 1991, the fair market rent for the ranch properties was $16,595 per year, net of property taxes.

Coastal Ranches contributed an unspecified amount of labor and materials in connection with its lease of decedent's ranch properties. During 1989, 1990, and 1991, Coastal Ranches paid property taxes, maintained fences, and paid utilities and other expenses associated with the Wineman properties.

In 1989, 1990, and 1991, decedent gave $10,000 in cash to each of her three children.

The Special Use Valuation Election

On its Form 706, U.S. Estate (and Generation-Skipping Transfer) Tax Return, petitioner claimed special use valuation for parcels 5, 6, 7, 8, and 9, pursuant to section 2032A. The election reduced petitioner's reported gross estate by $750,000, the maximum then permitted by law.

Respondent's estate tax attorney, Patricia Hiles (Ms. Hiles), sent a letter with an attached document request to the attorney for the estate on September 13, 1995. Paragraph 23 of the document request stated:

> The estate has submitted a one page computation of the
> Special Use Valuation which is not adequate to
> substantiate the special use valuation as required by
> IRS Regulations. If the estate wishes to retain the
> special use valuation reduction, and not have it

denied, then we will need the following within the next
60 days:

> a.  Who did this calculation submitted with the
> 706?
>
> b.  If there are any other data to support it,
> please submit copies.
>
> c.  It appears that the valuation is based upon
> what deceased received on her ranching operations.
> Please supply copies of those leases.
>
> d.  Please comply with Regulation 20.2032A-4 (copy
> enclosed for your convenience) that requires
> documentation which identifies specific comparable
> rentals and taxes for five years prior to date of
> death, arms length transactions, to determine the
> net rents.  (I am also enclosing a copy of the Tax
> Management discussion and example of how special
> valuations must be done in order to qualify.)  The
> Farm Credit Bank rate for the Sacramento
> District for 1992 was 11.50%. (See copy of Revenue
> Ruling 92-12 enclosed.)  A rate cannot be
> "assumed".
>
> e.  If the appropriate documentation for the
> special use valuation is not supplied, the
> $750,000 reduction will be disallowed, see
> Strickland, 92 TC 16, copy enclosed.

At a meeting with the estate's attorney, Richard Weldon, and the coexecutors on September 21, 1995, Ms. Hiles described the requirements of electing special use valuation pursuant to section 2032A(e)(7).  Ms. Hiles did not mention section 2032A(e)(8) because she did not believe the estate could properly elect special use valuation under that section.  After the meeting, Ms. Hiles extended the period for supplying the requested information to 90 days.  On December 12, 1995 (within

the 90-day period), petitioner, through its appraisal firm, Reeder, Gilman & Associates, submitted a section 2032A valuation report.

The report listed 10 properties in the vicinity of decedent's ranch properties and listed the then-current rates of rent, which ranged from $4.50 per acre to $15 per acre depending upon the carrying capacity of the land.  The report did not set forth the specific lease rates for any comparable properties in the 5 years preceding 1992, but stated:

> Rents for the land types on the subject have been
> static and current levels are representative of rents
> over the last five to ten years and are considered
> indicative of a five year average.

The report concluded:

> Parcels 5, 6, and 9 are more arid and would
> compete relatively low in the range.  Parcel 7,
> although the net grazing land is of good quality,
> competes lower than Parcel 8 because the difficulty of
> the terrain reduces the carrying capacity. * * *
> Parcel 8 is good grazing and competes well above the
> Nipomo parcels and the San Luis Obispo Ranch.

Petitioner's Special Use Valuation Report ultimately concluded that rental values for the properties were:  $6 per acre for parcels 5, 6, and 9; $7 per acre for parcel 7; and $8 per acre for parcel 8.

The report stated the following information with respect to taxes:

> The Williamson Act, which governs the taxing of
> land in Ag Preserves, sets up a methodology for

assessing land based upon rental values and built up capitalization rates.  As a result taxes, county-wide, are based upon the average income producing ability of like properties.  Since the tax assessment methods produce the same effect as an average, our estimate of taxes is based upon average of the 5 years prior to 1992.

The report did not list the taxes assessed and paid on the comparable ranch properties.

In calculating the special use values for each of decedent's properties, the report multiplied the gross rental per-acre value by the number of acres, then subtracted the actual taxes for that property to arrive at the net annual rent.  Each parcel's special use value was calculated by dividing net annual rental by 11.5 percent, the Farm Bank rate for June 1992 (Sacramento District).  Finally, the estate's pro rata share of the special use value was calculated by multiplying each parcel's special use value by the estate's percentage ownership.  According to the report, the total special use value for all elected properties was $127,681.[4]

OPINION

I.   Retained Life Estate in Parcel 3

The first issue for decision is whether decedent retained a life interest in the partial interests in her homestead property that she gave to her children.  Respondent increased decedent's

_____

[4]Petitioner's report uses the figure $127,936, which included $255 attributable to parcel 10, although petitioner did not elect special use valuation for parcel 10 on its Form 706.

gross estate by the value of a life estate in the aggregate 24-percent interest of her homestead property (parcel 3) that decedent gave to her children.  Respondent asserts that the value of that interest is properly includable in decedent's gross estate pursuant to section 2036(a) because she retained a life estate in that interest.[5]  Petitioner does not dispute respondent's valuation of the purported life estate but contends that decedent retained no such interest in her homestead property.  Petitioner bears the burden of proof.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).

In support of its contention that decedent retained no life estate in the children's partial interests, petitioner points out

---

[5]The pertinent part of sec. 2036 provides:

SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale * * *), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--

(1) the possession or enjoyment of, or the right to the income from, the property, or

(2) the right, * * * to designate the persons who shall possess or enjoy the property or the income therefrom.

that decedent used much less than 76 percent of parcel 3 and the main house.[6]  Petitioner also points to Dean's testimony to the effect that no agreement existed, implied or otherwise, for decedent to retain the possession and enjoyment of the partial interests at the time she transferred those interests to her children.  Respondent argues that Dean's testimony is self-serving and contrary to the objective facts and circumstances.  Although Dean's testimony was clearly self-serving, we disagree with the assertion that the testimony  was contrary to the objective facts and circumstances, and we ultimately agree with petitioner that decedent did not retain a life estate includable in her gross estate under section 2036.

A decedent's reservation of a life interest need not be provided for expressly in the instrument of transfer or enforceable under local law to be includable under section 2036.  See Estate of McNichol v. Commissioner, 29 T.C. 1179 (1958), affd. 265 F.2d 667 (3d Cir. 1959).  An implied agreement at the time of transfer for the decedent to continue possession or enjoyment of the property is sufficient and may be inferred from all the circumstances surrounding the transfer.  See Guynn v.

---

[6]Petitioner's argument implies that decedent owned 76 percent of the homestead property.  However, the parties stipulated that decedent owned 51 percent.  At trial, Dean testified that his father's testamentary trust owned the remaining 25 percent.

United States, 437 F.2d 1148, 1150 (4th Cir. 1971).  In determining whether an implied agreement existed, "all facts and circumstances surrounding the transfer and subsequent use of the property must be considered."  Estate of Rapelje v. Commissioner, 73 T.C. 82, 86 (1979); sec. 20.2036-1(a), Estate Tax Regs.

Decedent gave her children, collectively, a 24-percent interest in parcel 3.  Parcel 3 consisted of just over 10 acres and had two houses, two large barns, a small barn, a granary, a farm shop, cattle scales and corrals, two garages, and a small orchard.  Pursuant to its leases of decedent's properties, Coastal Ranches stored hay in the barns, used the corrals and farm shop, and kept vehicles in a garage and one of the big barns.  Decedent occupied the larger house, although Dean kept his desk and bookkeeping papers in one of the bedrooms and used it as an office.  Another bedroom was used primarily by Marian when she visited from Montana.  Coastal Ranches used an office in the main house.  Dean resided in the smaller house on the homestead property.  Other than the main house, decedent's personal use of parcel 3 was limited to the garden and small orchard next to the main house.

Decedent's limited personal use of the property does not prove the absence of an implied agreement.  In fact, the record is silent as to whether decedent could designate who might enjoy the property.  See sec. 2036(a)(2); see also United States v.

Byrum, 408 U.S. 125, 145 (1972) (possession and enjoyment are synonymous with substantial present economic benefit).  The fact that decedent personally used less than all of the property does not demonstrate that she did not possess and enjoy the entire property.

In contrast, where a decedent continues exclusive possession and continues to pay taxes and other property expenses after the transfer and the owner of record title neither charges rent nor takes possession of the property, these facts are highly indicative of an implied agreement.  See Guynn v. United States, supra at 1150; Estate of Rapelje v. Commissioner, supra at 87. Here, however, decedent shared the property with Dean and his wife and rented the property at a below-market rent (discussed in more detail infra sec. II) to Coastal Ranches.  Pursuant to its leases, Coastal Ranches paid the taxes and other property expenses associated with parcel 3.  These facts do not of themselves prove the absence of an implied agreement.

On balance, the objective facts convince us that an implied agreement giving decedent continuing possession and enjoyment of the entire homestead property did not exist.  Unlike the authority that has been cited in respondent's brief, this case involves a transfer of less than a fee simple interest in property.  The majority owner's continued use and possession of real property following transfer of a minority interest is not

unusual.  Cf. <u>Gutchess v. Commissioner</u>, 46 T.C. 554, 557 (1966) (where a husband transferred his entire interest in a homestead property to his wife, who then allowed him to live in the house without charge, the donor's continued use and enjoyment is a natural use which does not diminish the wife's enjoyment and possession).  In this case, decedent's continued use and possession of parcel 3, of which she owned a controlling interest, is natural in light of the children's minority ownership.  It is not surprising that the children did not seek to partition the property, since they also used the property regularly and they had only a minority interest in the property.

In addition to the objective facts, our decision rests heavily on Dean's testimony that there was no understanding between decedent and her children.  While his testimony was clearly self-serving, Dean's testimony was straightforward, unequivocal, and credible.  Respondent's counsel chose not to cross-examine him on this point.  Because we credit his testimony, we hold that petitioner has carried its burden of proving that there was no implied agreement.  Cf. <u>Hendry v. Commissioner</u>, 62 T.C. 861, 872 (1974).

## II.  Taxable Gifts Adjustment

The second issue is whether decedent rented ranch property to her children at a below-market rate, thereby making a taxable gift to her children.  In the notice of deficiency, respondent

determined that decedent had made taxable gifts to her children amounting to $53,784 that are properly includable in decedent's adjusted taxable gifts. Only $23,784 of that determination remains at issue and encompasses two types of gifts: (1) Checks of $10,000 delivered to each of decedent's three children and (2) below-market-value rental of decedent's ranch properties. After reducing the amount of the gifts by $10,000 to account for the annual exclusion, respondent determined that decedent had made taxable gifts to her children amounting to $5,595 in 1989, $11,595 in 1990, and $6,594 in 1991.

The parties stipulated that decedent made the first type of gifts. Respondent asserts that the information submitted by petitioner's expert on comparable rentals demonstrates that decedent's rate of rent was less than the market rate. Petitioner argues that decedent charged a market rate because Coastal Ranches paid various property-related expenses. We agree with respondent.

Petitioner's special use valuation report indicated that the annual fair market rent of decedent's pro rata interest in the parcels rented to Coastal Ranches was $14,725. The report did not identify a fair market rent for parcel 3. Respondent estimated that the annual fair market rent of decedent's 51-percent interest in parcel 3's land and improvements (excluding

the main house) was $1,872.[7]   Respondent determined that the

fair market rent of decedent's interests totaled $16,595, and

that the difference between actual rent charged and fair market

rent constituted a taxable gift.[8]

It is conceded that Coastal Ranches paid property taxes and

other expenses in connection with its leases of decedent's ranch

properties.  Dean testified that Coastal Ranches paid all the

property taxes, insurance, and maintenance (collectively, the

property expenses) on all the fences and ranch buildings.

However, petitioner was not able to establish the amounts of

those expenditures.[9]

Petitioner argues that the Court should estimate the amounts

of the property expenses paid pursuant to the leases and thereby

find that decedent charged a fair market rent.  See Cohan v.

---

[7]The difference between the sum of these figures, $16,597,
and the figure used in the notice, $16,595, is unexplained.

[8]The parties stipulated that decedent rented the ranch
lands, in toto, to Coastal Ranches for $5,000 in 1989, $5,000 in
1990, and $10,000 in 1991.

[9]Petitioner failed to share the salient documents with
respondent's counsel 15 days before trial, as required by the
Court's Standing Pre-Trial Order.  Respondent objected to a
question put to Dean regarding the amounts of property-related
expenses, on the grounds that the records themselves were the
best evidence of the expenses.  We sustained the objection.
Because the records had not been exchanged 15 days before trial
as required by the Court's Standing Pre-Trial Order, we also
sustained respondent's objection to petitioner's introduction of
the records themselves into evidence.

Commissioner, 39 F.2d 540 (2d Cir. 1930).  Respondent argues that the Court should make no estimate, because the Court lacks any evidentiary basis from which an estimate could be made.

Petitioner contends that the rent charged by decedent corresponded to a market rate because Coastal Ranches paid many expenses associated with maintaining the properties, including property taxes.  However, petitioner overlooks the fact that the fair market rental values, as calculated by petitioner's expert and used by respondent in the notice of deficiency, are net of property taxes; respondent used the net figures in computing the amount of taxable gifts.  The record does not reflect amounts paid for other property-related expenses.

We need not invoke the Cohan rule when the failure to introduce documentary evidence stems from the taxpayer's own intransigence.  See Lerch v. Commissioner, 877 F.2d 624, 629 (7th Cir. 1989), affg. T.C. Memo. 1987-295.  Moreover, we agree with respondent that the rule is inapplicable where, as here, the record lacks any evidentiary basis from which an estimate could be made.  See Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).  Petitioner has failed to prove that the rent charged by decedent corresponded to a market rate.  Since there is no

dispute that the below-market rent is a taxable gift under section 2503, respondent is sustained on this issue.[10]

III. Fair Market Value of Decedent's Real Estate

A.    Introduction

The penultimate issue in this case is the determination of the fair market value of decedent's interest in the Nipomo properties.  The positions of the parties and our conclusions with respect to the properties in dispute are as follows:

| Parcel | Petitioner's | | Respondent's | | |
| | Form 706 | Expert | Notice[1] | Expert | Court |
| --- | --- | --- | --- | --- | --- |
| 5 - El Suey | $485,000 | $485,000 | $732,105 | $819,000 | $580,153 |
| 6 - Nipomo | 205,000 | 205,000 | 302,315 | 331,000 | 247,860 |
| 9 - Lot 74 | 65,000 | 65,000 | 76,500 | 108,000 | 81,000 |
| 10 - The Pit | nominal | 150 | 34,950 | 8,000 | 1,750 |

[1]Statutory Notice of Deficiency.

Our analysis is set forth below.

Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."  United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs.  The willing buyer and the willing seller are purely

---

[10]A computational adjustment will be required to give effect to the parties' stipulation regarding decedent's cash gifts.  The parties stipulated that decedent gave $10,000 in cash to each child in 1989, although the taxable gifts adjustment in the notice of deficiency was based on a determination that decedent made an $8,000 gift to each child in that year.  The stipulated figure is given binding effect.  See Rule 91(e).

hypothetical.  See Propstra v. United States, 680 F.2d 1248, 1251-1252 (9th Cir. 1982); Estate of Robinson v. Commissioner, 69 T.C. 222, 225 (1977).  Fair market value of property as of any given date is a question of fact to be determined from the entire record.  See Lio v. Commissioner, 85 T.C. 56, 66 (1985), affd. sub nom. Orth v. Commissioner, 813 F.2d 837 (7th Cir. 1987). While we must consider the entire record, we have broad discretion in deciding which facts are most important in reaching a decision because "finding market value is, after all, something for judgment, experience, and reason".  Colonial Fabrics, Inc. v. Commissioner, 202 F.2d 105, 107 (2d Cir. 1953), affg. a Memorandum Opinion of this Court dated Jan. 22, 1951.

The determinations of value in respondent's statutory notice of deficiency are presumptively correct.  See Welch v. Helvering, 290 U.S. 111 (1933).  Petitioner bears the burden of proving that the fair market values of the properties are less than those determined by respondent.  See Rule 142(a).  Respondent bears the burden of proof with respect to any increases in value beyond those determined in the notice of deficiency.  See id.

In support of their positions, both parties presented expert testimony.  Both expert witnesses are appraisers:  Leslie J. Gilman (Mr. Gilman) for petitioner and David F. Hamel (Mr. Hamel) for respondent.  We do not list or discuss here the qualifications of the experts, because our decision is not based

on comparing qualifications, and listing them would unduly lengthen this opinion. The focus of our opinion is on the degree to which the experts' opinions are supported by the evidence.

In reviewing the conclusions of each expert, we may accept or reject expert testimony according to our own judgment, and we may be selective in deciding what parts of an expert's opinion, if any, we will accept. See Parker v. Commissioner, 86 T.C. 547, 562 (1986). Conclusory opinions that are unexplained or contrary to the factual evidence will be rejected. See Compaq Computer Corp. v. Commissioner, T.C. Memo. 1999-220.

B.    Petitioner's Expert

Mr. Gilman appraised decedent's real estate interests in conjunction with the filing of petitioner's Form 706. He also prepared an update of that appraisal as an expert report in conjunction with this litigation. Mr. Gilman used the sales comparison approach[11] to determine the fair market value of decedent's interest in the properties. Mr. Gilman chose nine properties that he determined were comparable to the ranch

---

[11]The sales comparison approach, also known as the comparable sales or market data approach, is "'generally the most reliable method of valuation, the rationale being that the market place is the best indicator of value, based on the conflicting interests of many buyers and sellers.'" Estate of Spruill v. Commissioner, 88 T.C. 1197, 1229 n.24 (1987) (quoting Estate of Rabe v. Commissioner, T.C. Memo. 1975-26, affd. without published opinion 566 F.2d 1183 (9th Cir. 1977)).

properties.  He also supplied sales data for two sales that occurred after his original appraisal.

Mr. Gilman or his associate, Ed Hawkes, verified each sale and personally inspected each comparable property.  In his report Mr. Gilman provided the date of sale, location, price, number of acres, and price per acre of each comparable property.  Prices per acre ranged from a low of $200 (an 11,250-acre ranch near King City, about 120 miles to the north of decedent's Nipomo properties) to $1,100 (several properties in Santa Barbara, San Luis Obispo, and Monterey Counties).  The report contained a summary description of each comparable property, with comments indicating similarities and differences between the comparable and subject properties.

Without indicating exactly what adjustments were necessary between the comparable and subject properties, Mr. Gilman concluded:

> It is our opinion based on the sales data that a sales price of $1,000 per acre is an appropriate estimate of value for ranches with strong residential characteristics or ranches that are located in areas with strong urban influence that appeals to upscale buyers.  It is our opinion that Machado Ranch fits within this category.  Because of its shape, topography, and location the Rancho El Suey presents fewer opportunities for residential development.  The Rancho Nipomo parcels appear to offer access difficulties and even greater topographic difficulties than the Rancho El Suey.  It is our opinion that these parcels compete lower in the range; inferior to the sales with strong residential characteristics, but superior to the strictly grazing properties and the

parcels with the most difficult problems. It is our opinion that the appropriate estimate of market value for each of these parcels is $750 per acre.

Because of its marginal utility, it is our opinion that * * * [parcel 10-the Pit] is of less value per acre than the lowest priced sales. It is our opinion that the only possible market for the parcel is a neighboring land owner. Since the parcel would add little or no utility to the neighboring parcel, its value is accordingly nominal.

Respondent criticized Mr. Gilman's failure to specify in his report whether an adjustment was made to comparable properties located in an agricultural preserve. Mr. Gilman's report does not indicate whether the comparable properties were in agricultural preserves; however, if they were not, a positive adjustment would have been required because a hypothetical willing buyer would likely prefer the absence of such a contractual restriction. If the comparable properties were located in agricultural preserves, no adjustment would have been required. Thus, we agree with petitioner that the lack of adjustment, if any had been required, would have tended to result in an overvaluation of decedent's property interests.

After determining that the value of a fee simple interest was $750 per acre for the Nipomo ranch properties and $1,000 per acre for the Machado Ranch, Mr. Gilman proceeded to calculate the value of decedent's partial interests in the properties. He examined six sales of partial interests and determined the partial interest discount for each comparable sale. Comparing

actual sale prices to the estimated pro rata share of market value, Mr. Gilman concluded that a 15-percent discount would be appropriate for decedent's 50- and 51-percent interests (parcels 5, 6, and 10), and that a 20-percent discount was appropriate for decedent's 25-percent interest in parcel 8.[12]  Mr. Gilman multiplied the estimated value of a fee simple interest in each property by decedent's pro rata ownership interest and reduced the product by his indicated discount rate.  We find Mr. Gilman's analysis regarding the partial interest discounts helpful and incorporate that analysis into our findings.

In contrast, we do not find the portion of Mr. Gilman's report that analyzed the per-acre values of the Nipomo properties helpful.  In that section, the report is far too conclusory and suffers generally from a dearth of data.  While the report lists comparable properties, it lacks any detailed analysis of those properties in relationship to the subject properties.  We also have concern over Mr. Gilman's choice of comparable properties.  Some of the properties are hundreds of miles away from the subject properties.  Although Mr. Gilman explained his selection of these properties as providing the value based on grazing use

_____

[12]Mr. Gilman's analysis that a partial interest discount was warranted for parcel 10 was predicated on his assumption that decedent owned 51 percent of that property.  As discussed infra sec. III.D.2, on the record before us, we find that decedent owned 100 percent of parcel 10.

alone, i.e., the lower range of indicated value, we reject that explanation.  Mr. Gilman did not select any comparable properties that would provide an upper range of indicated value, such as ranches in the Santa Ynez Valley.  We are unable to determine how much weight Mr. Gilman gave the various comparable properties because of the lack of an adjustment grid.  Ultimately, these flaws lead us to reject the per-acre values indicated by his report.  See Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441 (1980).

C.    Respondent's Expert

Mr. Hamel also used the Sales Comparison Approach to determine the fair market value of decedent's interests in the ranch properties.  In contrast to Mr. Gilman, who valued each parcel individually, Mr. Hamel valued the four Nipomo properties as if they were one integrated ranch property of 2,242 acres.[13]

Mr. Hamel's selection of comparable ranch properties included 12 sales occurring before the valuation date and four sales occurring within 3 years thereafter.  Mr. Hamel's report contains photos of the subject and comparable properties, topographic and plat maps, and an adjustment grid reflecting adjustments for parcel size and market timing.  In the text of

---

[13]Petitioner did not criticize Mr. Hamel on this point.  We treat this as a concession that the integrated ranch approach is appropriate in this case for the Nipomo properties, with the exception of parcel 10.

his report, Mr. Hamel stated that he relied more heavily upon 10 of the 16 comparable sales for his opinion.

Of those 10 properties, sale prices per acre ranged from $600 (a 3,500-acre parcel known as the Biddle Ranch, sold almost 3 years after the valuation date) to $1,996 (a 248-acre parcel located east of Nipomo and roughly 10 miles to the northwest of decedent's Nipomo properties). Mr. Hamel adjusted the latter sale downward by $500 to account for the small size of the parcel relative to the combined size of the Nipomo properties. Mr. Hamel added $388 per acre to the Biddle Ranch sale as a market timing adjustment. After adjustment, these properties were valued at $988 and $1,496, respectively. Similar adjustments for size and market timing were made to a few other comparables. From his data, Mr. Hamel concluded that the value of a fee simple interest in the Nipomo properties was $1,200 per acre.

Petitioner criticized Mr. Hamel's selection of comparable properties, claiming his selection resulted in an overestimation of the fair market value of decedent's ranch properties. We agree with this criticism. Mr. Hamel's selection of comparable properties included properties in the Santa Ynez River Valley, yet no location adjustment was indicated for those properties. In fact, no location adjustment was made for any of Mr. Hamel's comparable properties, including those sold to Hollywood celebrities who presumably were not interested in using the

properties for grazing.  Under cross-examination, Mr. Hamel admitted that the Nipomo and Santa Maria properties had not achieved the cachet of the Santa Ynez River Valley.  Inclusion of these properties, without location adjustment, leaves us with serious concerns as to Mr. Hamel's conclusions regarding market value.

Similarly, Mr. Hamel did not make any adjustment for the presence of irrigated cropland in at least one of his comparable sales,[14] nor did he make any adjustment for water supply, zoning, or topography.  Other than a downward adjustment to smaller parcels, the only adjustment Mr. Hamel made to the comparables was a market timing adjustment.  Although Mr. Hamel stated under cross-examination that he gave the sale containing irrigated row crops less weight in his overall analysis, his report does not so state.

Respondent explains the absence of adjustments for zoning, water supply, and location by asserting that no adjustment was necessary because all the comparable properties were cattle ranches.  We reject respondent's explanation because it ignores the increased value that agricultural property may derive from proximity to a metropolitan or resort area.  See, e.g., Estate of

---

[14]Interestingly, Mr. Hamel had adjusted for the presence of the irrigated cropland in a sales data sheet prepared in 1991 while he was employed by Reeder, Gilman & Associates.

Hughan v. Commissioner, T.C. Memo. 1991-275. Such an increase in value can be seen even where the agricultural land is subject to land use restrictions similar to those burdening the properties at issue in this case. See id. At a minimum, Mr. Hamel should have adjusted the comparables to reflect the difference between those cattle ranches that are desirable for second home use, such as those from which distant ocean views are available, and those properties that are not so desirable.

In a similar vein, respondent defends Mr. Hamel's lack of water supply adjustment on the grounds that the subject properties all had adequate water for grazing. Because we think that a hypothetical buyer and seller would attribute a higher value to a property with good water, all other things being equal, we do not accept that explanation. See sec. 20.2031-1(b), Estate Tax Regs. The class of hypothetical buyers is not limited to those interested solely in the grazing value of the land.

Mr. Hamel added $399 to $621 per acre (1.5 percent per month) as a market timing adjustment for those comparable properties sold after the valuation date. He based his market timing adjustment on sales in the vicinity of the subject properties and concluded that property values peaked as of June 1992. On cross-examination regarding his market timing adjustment, Mr. Hamel acknowledged that graphs from published surveys on market trends, included in the addendum to his report,

indicated a somewhat different state of affairs.  Despite admitting that he was probably one of the authors of the reports from which the graphs were taken, Mr. Hamel sought to discredit these graphs on the basis that they merely indicated the consensus of the five or six individuals on the various committees.  After reviewing the information as presented in his report, we do not find Mr. Hamel's explanation convincing.  The inconsistency causes us to question his conclusion that market values for San Luis Obispo County rangeland peaked as of the valuation date, leaving us with skepticism regarding the propriety and amount of his market timing adjustment.

1.   Mr. Hamel's Adjustments for Decedent's Partial Interests

Once the per-acre value was obtained, the value of decedent's pro rata interest in each Nipomo property was obtained by multiplying the number of acres in each property by $1,200.  The resulting figure was reduced by the percentage corresponding to decedent's pro rata ownership in each parcel.  A partial interest discount was then calculated.

To calculate the amount of the partial interest discount, Mr. Hamel examined 21 sales of partial interests.  He found that an inverse relationship existed between the size of the pro rata interest and the amount of the adjustment, and he predicted that smaller fractional interests would lead to larger discounts.  He

concluded that a discount of 10 percent was appropriate for parcels 5 and 10, of which decedent owned 51-percent interests. For parcel 6, of which decedent owned a 50-percent interest, Mr. Hamel concluded that a 15-percent discount was appropriate.

We do not agree with Mr. Hamel's conclusions regarding the appropriate discount, because we disagree with his inclusion of certain data in his analysis. Some of the purportedly comparable sales of partial interests, such as the sale that indicated a 4-percent discount, resulted in the purchaser's owning a 100-percent interest. A buyer consolidating all the fractional interests is likely to pay a premium for those interests. Such a sale does not indicate the appropriate discount applicable between the hypothetical willing buyer and willing seller for a partial interest. Inclusion of those sales skewed Mr. Hamel's analysis; as a result we find Mr. Gilman's conclusions regarding the appropriate discount more reliable.

Ultimately, we find the conclusions in Mr. Hamel's report to be questionable, in light of the analytical flaws mentioned above. Mr. Hamel's use of data was incomplete and his conclusions, therefore, suspect.

D. Conclusions Regarding Fair Market Value

Recognizing that valuation is not an exact science, see Messing v. Commissioner, 48 T.C. 502, 512 (1967), and selecting those portions of each expert's report that we found helpful, see

Parker v. Commissioner, 86 T.C. at 562, we conclude the following with respect to the fair market value of decedent's interest in each of the Nipomo properties.

1.    Per-Acre Value of the Nipomo Properties

We conclude that the per-acre value of a fee simple interest in parcels 5, 6, and 9 was $900.  This represents a 25-percent reduction from Mr. Hamel's indicated value of $1,200. Considering the paramount importance of location in valuing real estate, Mr. Hamel's failure to adjust for location in his report was material.  Our determination of fair market values takes into account his failure to adjust for location and for differences in zoning, irrigated land, water rights, and other factors for which he should have adjusted but did not.

We conclude that the fair market value of a fee simple interest in parcel 10 was $1,750, or approximately $250 per acre. Petitioner claimed that the per-acre value of the property was approximately $50, while Mr. Hamel valued it at $1,200, the same as the other Nipomo parcels.  However, in the text of his report, Mr. Hamel noted the difficulties associated with this parcel:

> Parcel 10 is, in my opinion, an uneconomic remnant that was the result of a realignment of Highway 166. Planning officials in San Luis Obispo have stated that bisection by a public road generally does not result in the creation of a new legal parcel.

Because we think that a transaction between a hypothetical willing buyer and willing seller would factor in the possibility

that land use restrictions might yield to development of parcel 10, we find that the parcel had more than nominal value. However, we cannot agree with Mr. Hamel that parcel 10 had a per-acre value equal to that of the other Nipomo properties.

### 2. Decedent's Pro Rata Interest

The parties agree as to decedent's percentages of pro rata ownership of the Nipomo properties, except with respect to parcel 10. We find that decedent owned 100 percent of parcel 10. In their respective briefs, petitioner asserted that decedent's ownership was "not specified", and respondent asserted that it was 100 percent. In the statutory notice, respondent specified whether a partial interest was associated with each property and did not so specify with regard to parcel 10. In its petition, petitioner alleged that respondent erred as to his valuation of parcel 10 as follows: "i. The fair market value of a 6.99 acre parcel of land in a hole at the southwest corner of Highway 154 and Bull Canyon Road * * * was $0.00." The record lacks any evidence that indicates that decedent owned less than a fee simple interest in parcel 10, even assuming that petitioner alleged error with respect to this issue by amended pleading. See Rule 41(b). Thus, we sustain respondent's determination of decedent's ownership interest in parcel 10, see Rule 142(a), although, as indicated above, we do not sustain respondent's determination of the parcel's value.

3.   Partial Interest Discount

Both parties agree that a partial interest discount is appropriate in this case.  Their positions differ only as to the size of the discount.  For parcels 5 and 6, we find that a 15-percent partial interest discount is warranted.  As discussed above, in calculating the appropriate amount of the partial interest discount, we found the calculations of petitioner's expert more helpful and reliable than those of respondent's expert.  Accordingly, we have used the discounts suggested by petitioner's expert in reaching our conclusion.[15]  See Parker v. Commissioner, supra at 562; Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. at 452.

4.   Calculation of the Fair Market Value of Decedent's Interests

We calculated the fair market values of decedent's interests in parcels 5, 6, 9, and 10 in accordance with the following formula:

| Parcel | No. of acres | X | FMV per acre | X | Decedent's pro rata interest | X | Partial interest discount | = | Total |
|--------|-------|---|------|---|------|---|------|---|-------|
| 5 | 1,487 | | $900 | | .51 | | .85 | | $580,153 |
| 6 | 648 | | 900 | | .50 | | .85 | | 247,860 |
| 9 | 90 | | 900 | | 1.00 | | 1.00 | | 81,000 |
| 10 | 7 | | 250 | | 1.00 | | 1.00 | | 1,750 |

_____

[15]Respondent's expert also concluded that decedent's 50-percent interest in parcel 6 warranted a 15-percent partial interest discount.

IV.   The Special Use Valuation

    A.   Introduction

    The last issue for decision concerns petitioner's election to value the interests in certain ranch properties under section 2032A.  On its Form 706, petitioner elected special use valuation for several properties, claiming that it is entitled to the $750,000 reduction in value for special use under section 2032A. Respondent contends that petitioner may not take advantage of section 2032A because it failed to comply with the statutory and regulatory requirements for an election pursuant to that section.

    Section 2032A allows an executor to elect to value real property on the basis of its value for farming purposes rather than its fair market value.  See Stovall v. Commissioner, 101 T.C. 140, 146 (1993); sec. 20.2032A-3(a), Estate Tax Regs.  A reduction of up to $750,000 is permitted.[16]  See sec. 2032A(a)(2). Congress enacted the provisions allowing special use valuation with the goal of reducing the estate tax burden on small family farms and businesses, thereby limiting the liquidity problems and forced sales of those businesses, with the ultimate goal of allowing continued family operation of the qualifying farms and

_____

[16]Sec. 501(b) of the Taxpayer Relief Act of 1997, Pub. L. 105-34, 111 Stat. 846, amended sec. 2032A(a) to provide an adjustment for inflation, effective for estates of decedents dying after Dec. 31, 1997.  As decedent died before the effective date, the adjustment for inflation is not applicable.

businesses.  See Estate of McAlpine v. Commissioner, 96 T.C. 134, 139 (1991), affd. 968 F.2d 459 (5th Cir. 1992).

The requirements for a valid section 2032A election are numerous, technical, and complex.  Although section 2032A is a relief statute designed to encourage the continuation of family farms, it provides for "exceptionally favorable tax treatment", and taxpayers must "come within its demanding terms".  Martin v. Commissioner, 783 F.2d 81, 84 (7th Cir. 1986), affg. 84 T.C. 620 (1985).  Over the years since enactment, procedural foot faults have cost many estates the benefits that section 2032A might have afforded.  See, e.g., Estate of Strickland v. Commissioner, 92 T.C. 16 (1989); Estate of McDonald v. Commissioner, 89 T.C. 293 (1987), affd. as to this issue 853 F.2d 1494 (8th Cir. 1988); Estate of Johnson v. Commissioner, 89 T.C. 127 (1987).

In general, estates that make timely elections that fail to contain all required information have 90 days to provide the missing information after notification of the defects.  See sec. 2032A(d)(3).[17]

---

[17]Sec. 2032A(d)(3) provides:

SEC. 2032A(d).  Election; Agreement.--

*    *    *    *    *    *    *

(3) Modification of election and agreement to be permitted.--The Secretary shall prescribe procedures which provide that in any case in which--

(continued...)

B.    Respondent's Motion in Limine

Respondent sought to exclude two documents pertaining to petitioner's section 2032A election by motion in limine.  In his motion, respondent argues that neither document is relevant to the issue of whether petitioner made a valid section 2032A election solely because petitioner's notice of election failed to comply substantially with the regulations.  The Court deferred ruling on the motion until such time as the exhibits were introduced.  At that time, respondent renewed his objections.  For the reasons that follow, we deny respondent's motion.

By letter dated September 13, 1995, respondent's estate tax attorney, Ms. Hiles, notified the executors that the estate's

---

[17](...continued)
          (A) the executor makes an election under paragraph (1) within the time prescribed for filing such election, and

          (B) substantially complies with the regulations prescribed by the Secretary with respect to such election, but--

                (i) the notice of election, as filed, does not contain all required information, or

                (ii) signatures of 1 or more persons required to enter into the agreement described in paragraph (2) are not included on the agreement as filed, or the agreement does not contain all required information,

     the executor will have a reasonable period of time (not exceeding 90 days) after notification of such failures to provide such information or agreements.

computation of special use valuation was inadequate because the documentation submitted did not identify "specific comparable rentals and taxes for five years prior to date of death, arms length transactions to determine the net rents" as required by section 20.2032A-4, Estate Tax Regs. Ms. Hiles' notification, however, contained no reference to section 2032A(e)(8) and did not identify any deficiencies with respect to the requirements of section 2032A(e)(8). On December 12, 1995, petitioner submitted additional documentation (hereinafter Exhibit 13-M) through its appraisal firm, Reeder, Gilman & Associates. This additional documentation was received by respondent within the 90-day curative period provided under section 2032A(d)(3).

On August 6, 1998, Reeder, Gilman & Associates completed an update to its special use valuation report of December 12, 1995 (hereinafter Exhibit 29). Obviously, Exhibit 29 was submitted well beyond the 90-day curative period, which ended on December 12, 1995.

Before 1997, the availability of the 90-day curative period depended upon the estate's substantial compliance with the regulations. See Estate of Strickland v. Commissioner, supra at 23. In 1997, Congress deleted the substantial compliance requirement of section 2032A(d)(3), effective for estates of decedents dying after August 5, 1997. See Taxpayer Relief Act of 1997, Pub. L. 105-34, sec. 1313(a), 111 Stat. 1045. Despite the

effective date, respondent concedes on brief that the amended statute is applicable to petitioner.[18]

There is no dispute that petitioner timely submitted the recapture agreement described in section 2032A(d)(2). Because Congress deleted the requirement of substantial compliance in 1997, and respondent has now conceded the amendment's retroactive application to petitioner, the only remaining requirement for curative information is that it be timely submitted after notice of defect has been given. Here, there is no dispute that Exhibit 13-M was timely. Thus, we must deny respondent's motion with respect to that exhibit because it bears directly upon the issue of whether a valid section 2032A election was made. With respect to Exhibit 29, however, this information was clearly submitted well beyond the 90-day period allowed by statute. But since the notification provided pursuant to section 2032A(d)(3) did not identify any deficiencies in petitioner's election as it relates to section 2032A(e)(8), the 90-day curative period with respect to section 2032A(e)(8) has not commenced and, consequently, does not foreclose submission of additional material arguably relevant to the section 2032A(e)(8) requirements. For these reasons,

---

[18]Congress intended that, "with respect to technically defective 2032A elections made prior to the date of enactment, prior law should be applied in a manner consistent with the provision." H. Conf. Rept. 105-220, at 720 (1997).

therefore, we deny respondent's motion and admit the subject
reports.

C.   Requirements for Special Use Valuation

Only one of the requirements for a valid section 2032A
election is at issue here; i.e., the requirement that a notice of
election contain the method of valuation based on use.  See sec.
20.2032A-8(a)(3)(viii), Estate Tax Regs.  Section 2032A(e)(7)
provides the general formula and method to be used in valuing
farm property:

> (7) Method of valuing farms.--
>
>> (A) * * * the value of a farm for farming
>> purposes shall be determined by dividing--
>>
>>> (i) the excess of the average
>>> annual gross cash rental for comparable
>>> land used for farming purposes and
>>> located in the locality of such farm
>>> over the average annual State and local
>>> real estate taxes for such comparable
>>> land, by
>>>
>>> (ii) the average annual effective
>>> interest rate for all new Federal Land
>>> Bank loans.
>
> For purposes of the preceding sentence, each average
> annual computation shall be made on the basis of the 5
> most recent calendar years ending before the date of
> the decedent's death.
>
>> *     *     *     *     *     *     *
>>
>> (C) Exception.--The formula provided by
>> subparagraph (A) shall not be used--
>>
>>> (i) where it is established that
>>> there is no comparable land from which

> the average annual gross cash rental may be determined * * *, or
>
> (ii) where the executor elects to have the value of the farm for farming purposes determined under paragraph (8).

Petitioner maintains that its special use valuation report provided sufficient information to satisfy section 2032A(e)(7) and the regulations thereunder. In the alternative, petitioner maintains that its method of valuation qualified under section 2032A(e)(8). Respondent disagrees with both assertions.

1. Section 2032A(e)(7)

The regulations interpreting section 2032A(e)(7) provide that, in general, the special use value of farm real property is determined by:

> (1) Subtracting the average annual state and local real estate taxes on actual tracts of comparable real property in the same locality from the average annual gross cash rental for that same comparable property, and
>
> (2) Dividing the results so obtained by the average annual effective interest rate charged on new Federal land bank loans. [Sec. 20.2032A-4(a)(1) and (2), Estate Tax Regs.]

The first issue we must decide is whether petitioner complied with paragraph (1), above. It is undisputed that petitioner did not submit information on property taxes on comparable properties. Petitioner asserts that this lack of information should not invalidate its election because the omission has not

operated to respondent's detriment.  Respondent does not address this argument squarely but maintains that the omission of property tax information is fatal to the election.

Petitioner makes a creative, if not entirely convincing, argument.  Information on property taxes is a required element of the capitalization of rents formula.  See sec. 2032A(e)(7)(A)(i); Estate of Strickland v. Commissioner, 92 T.C. at 26.  Under the statutory formula, plugging in the number zero to the formula in the absence of tax information would yield higher special use values.  Thus, petitioner's argument that the information is optional is not without some appeal in logic and common sense.  However, the requirement that an estate provide information on the property taxes paid on the comparable properties also serves to substantiate the claimed special use valuation.[19]  See Estate of Strickland v. Commissioner, supra at 24.  In any event, we need not and do not decide whether the absence of property tax information, standing alone, is fatal to petitioner's special use election because other requirements of section 2032A(e)(7) and the regulations thereunder were not satisfied within the 90-day curative period.

---

[19]Information on property taxes may serve to substantiate the gross cash rental figures used in the calculation, because some rough proportionality between the figures would normally be expected.

In order to measure the special use value of a farm under section 2032A(e)(7), an executor must use information on actual tracts of comparable real property for each of the 5 calendar years preceding the year in which the decedent died. See sec. 2032A(e)(7)(A); sec. 20.2032A-4(a), Estate Tax Regs. In this case, the applicable years are 1987 through 1991. Appraisals or other statements regarding rental value or areawide averages of rentals, including those compiled by the U.S. Department of Agriculture, may not be used because they are not true measures of the actual cash rental value of comparable properties in the same locality as the specially valued property. See sec. 20.2032A-4(b)(2)(iii), Estate Tax Regs.

Petitioner's special use valuation report, submitted on December 12, 1995, within the 90-day period, provided current lease information on 10 comparable properties and stated that "Rents for the land types on the subject have been static and current levels are representative of rents over the last five to ten years and are considered indicative of a five year average."

Petitioner argues that it complied with the regulations because the assertion that rents were static rendered unnecessary any separate listing of actual rents during 1987-91. However, the language of the report belies petitioner's claim that the current rents on each property were static. Regarding rents, the report asserts that "rental levels are * * * indicative of a five

year average." Thus, the report does not indicate the actual cash rentals of comparable real property for the period 1987-91. Instead, the report provides actual cash rentals of 10 comparable properties for 1995 and an impermissible appraisal asserting that the 1995 rental values were indicative of the 1987-91 rental values. See sec. 2032A-4(b)(2)(iii), Estate Tax Regs. As in Estate of Strickland, petitioner has failed to identify annual gross cash rentals of comparable real property and State and local taxes for such comparable properties for the requisite 5 calendar years preceding decedent's date of death. Petitioner's failure to comply with the requirements of section 2032A(e)(7)(A) and the regulations thereunder precludes special use valuation for the properties under that section. See Estate of Strickland v. Commissioner, supra at 33.

        2.    Section 2032A(e)(8)

     Petitioner maintains, in the alternative, that it was entitled to value the properties under section 2032A(e)(8), that the information submitted to the Service within the 90-day period was adequate for that purpose, and that, in essence, respondent's failure to mention section 2032A(e)(8) at any time before trial makes the requirements of that section new matter. Respondent takes exception to all aspects of petitioner's alternative argument. In essence, respondent contends that petitioner may not switch theories in midstream, and that, even if petitioner

were entitled to use the valuation formula of section 2032A(e)(8), it has not supplied sufficient information to comply with the requirements of that section.  We reject respondent's contentions and hold that petitioner made a valid election to value the properties under section 2032A(e)(8).

>    a.    Section 20.2032A-4(b)(2)(i), Estate Tax Regs.

The first issue is whether petitioner elected to value the property under section 2032A(e)(8).  Citing section 20.2032A-4(b)(2)(i), Estate Tax Regs., petitioner argues that it made an election, by default, to value the properties under the method provided by section 2032A(e)(8).  Respondent disagrees.[20]

---

[20]Respondent's position on brief contradicts the position taken in a motion in limine.  In that motion, respondent stated as follows:

> Even though an estate initially has elected to value farm property pursuant to § 2032A(e)(7), the estate can still avail itself of the special use valuation provided under I.R.C.§ 2032A(e)(8).  Section 20.2032A-4(2)(i), Estate Tax Regs. states, in part, "[i]f the executor does not identify such property and cash rentals, all specially valued real property must be valued under the rules of section 2032A(e)(8) if special use valuation has been elected."  Therefore, if the estate attempts to comply with § 2032A(e)(7) but fails to identify the comparable property and cash rentals, the estate may qualify under § 2032A(e)(8), provided the information submitted by the estate substantially complies with the requirements of the regulations.  * * *

Respondent subsequently conceded on brief that whether petitioner substantially complied with the requirements of sec. 2032A and related regulations is no longer an issue.

Respondent's argument rests upon section 2032A(e)(7), which provides that unless an exception applies, the value of a farm for farming purposes shall be measured according to the capitalization of rents formula of that section. See sec. 2032A(e)(7)(A), (C). Only two exceptions are potentially applicable here: (1) Where there is no comparable land from which average annual gross cash rental may be determined or (2) where the executor elects to value the farm property under section 2032A(e)(8). See sec. 2032A(e)(7)(C).

In this case, petitioner has not proven that there was no comparable land from which the average annual gross cash rental may be determined within the meaning of section 2032A(e)(7)(C)(i). In fact, petitioner has acknowledged implicitly that there was comparable land available. The only dispute, therefore, is whether petitioner elected to use the valuation formula of section 2032A(e)(8), as required by section 2032A(e)(7)(C)(ii).

By regulation, the Secretary has determined that "If the executor does not identify such [actual comparable] property and cash rentals, all specially valued real property must be valued under the rules of section 2032A(e)(8)". Sec. 20.2032A-4(b)(2)(i), Estate Tax Regs. The regulation provides, in effect, that where an executor fails to provide sufficient documentation to use the capitalization of rents method described in section

2032A(e)(7), the executor, by default, has elected to use the valuation formula of section 2032A(e)(8).  See id.; see also Estate of Strickland v. Commissioner, 92 T.C. at 32.  The regulation, by its terms, makes the election to use section 2032A(e)(8) automatic if the executor elects special use valuation but fails to identify the comparable properties and cash rentals necessary to calculate a property's special use value under section 2032A(e)(7).

On brief, respondent does not address the plain language of the regulation.  Instead, respondent argues that allowing petitioner to value the properties under a different method of election than originally elected should be precluded, as it would purportedly encourage other taxpayers to play the audit lottery.  Respondent also asserts that the default election is foreclosed by case law.

We fail to see how allowing an estate to use the special use method of section 2032A(e)(8) encourages the so-called audit lottery.  Cf. Rev. Rul. 83-115, 1983-2 C.B. 155 (an executor may change the method of special use valuation after the election has been made); see also Estate of Rogers v. Commissioner, T.C. Memo. 2000-133.  This is particularly true where the Secretary has promulgated a regulation making the election automatic.  The Secretary chose to craft the regulation in a taxpayer-friendly fashion.  Given the purpose of section 2032A, we cannot say that

the Secretary was wrong in doing so.  We are unconvinced by respondent's policy-based arguments and do not discuss them further.

Relying upon Estate of Strickland v. Commissioner, supra at 32, where we commented on the apparent inconsistency between the statute and the regulation, respondent asserts that this Court has already decided that if comparable property existed from which the average gross cash rental values could be determined, a taxpayer was not entitled to value the property using the method set forth in section 2032A(e)(8).  We do not agree with respondent's interpretation of the Estate of Strickland case.

Contrary to respondent's assertion, we did not decide that failure to document comparable properties precluded a default election to value property under section 2032A(e)(8).  In Estate of Strickland, the taxpayer failed to document comparable property in accordance with the regulations and thus did not comply with the documentation requirements of section 20.2032A-4, Estate Tax Regs.  Therefore, we held that the estate could not value its farm real property under section 2032A(e)(7)(A).  The estate's alternate position, that it was entitled to value its property under the net share method of section 2032A(e)(7)(B), failed because we found that comparable properties rented for cash existed in the locality.  The estate did not argue that it

had made a default election to value its property under section 2032A(e)(8).

In Estate of Strickland, we did not need to decide the meaning of section 20.2032A-4(b)(2)(i), Estate Tax Regs., because following the regulation would have led to the same result. That was because, under the facts present in Estate of Strickland, "a valuation pursuant to section 2032A(e)(8) will equal the fair market value of the property on the date of decedent's death." Estate of Strickland v. Commissioner, supra at 33.

Section 2032A provides the Secretary with the authority to determine by regulation how section 2032A elections are to be made. See sec. 2032A(d)(1); Estate of Gunland v. Commissioner, 88 T.C. 1453, 1455 (1987). By regulation, the Secretary has determined that an executor elects the application of section 2032A(e)(8) whenever an executor, having elected special use valuation, fails properly to document comparable property under the rules of section 2032A(e)(7). See sec. 20.2032A-4(b)(2)(i), Estate Tax Regs. Respondent has not supplied a cogent reason why we should disregard the plain meaning of section 20.2032A-4(b)(2), Estate Tax Regs. We conclude that the apparent inconsistency between the statute and the regulation noted in Estate of Strickland evaporates when considered in light of the Secretary's legislatively conferred authority to determine the manner in which section 2032A elections are to be made.

We hold that petitioner's special use valuation election encompassed the right to value the property under section 2032A(e)(8) in the event petitioner failed properly to document comparable properties under section 2032A(e)(7).  Because petitioner failed to identify comparable properties sufficient for purposes of section 2032A(e)(7), the property must be valued under the rules of section 2032A(e)(8).  See sec. 20.2032A-4(b)(2)(i), Estate Tax Regs.

      b.    <u>Special Use Valuation Under Section 2032A(e)(8)</u>

Section 2032A(e)(8) sets forth five factors to be used in measuring the value of real property used for farming or closely held business purposes as follows:

> (8) Method of valuing closely held business interests, etc.--In any case to which paragraph (7)(A) does not apply, the following factors shall apply in determining the value of any qualified real property:
>
> > (A) The capitalization of income which the property can be expected to yield for farming or closely held business purposes over a reasonable period of time under prudent management using traditional cropping patterns for the area, taking into account soil capacity, terrain configuration, and similar factors,
>
> > (B) The capitalization of the fair rental value of the land for farmland or closely held business purposes,
>
> > (C) Assessed land values in a State which provides a differential or use value assessment law for farmland or closely held business,

      (D) Comparable sales of other farm or closely held business land in the same geographical area far enough removed from a metropolitan or resort area so that nonagricultural use is not a significant factor in the sales price, and

      (E) Any other factor which fairly values the farm or closely held business value of the property.

The statute clearly provides that all factors shall apply, joining them with the conjunction "and". See Estate of Hughan v. Commissioner, T.C. Memo. 1991-275. However, the factors used in any given circumstance are limited to those which are relevant. See id. Section 2032A(e)(8) prescribes a subjective method of valuation, in contrast to the objective method of section 2032A(e)(7). See Estate of Klosterman v. Commissioner, 99 T.C. 313, 317 n.4 (1992), affd. 32 F.3d 402 (9th Cir. 1994). The legislative history confirms that all relevant facts are taken into account when the multiple factor method of valuation is elected. See S. Rept. 94-938 (Part 2), at 15 (1976), 1976-3 C.B. (Vol. 3) 643, 657; see also Estate of Hughan v. Commissioner, supra.

In Estate of Hughan, the estate's section 2032A election was disallowed on audit for failure properly to document comparable property under the rules of section 2032A(e)(7). In accordance with section 20.2032A-4(b)(2)(i), Estate Tax Regs., the Service's examiner increased the value of the farmland pursuant to an appraisal under the multiple factor method of section

2032A(e)(8). The validity of the estate's election was stipulated by the parties. Thus, the only issue in Estate of Hughan was how the farm's value was to be calculated under the multiple factor method of section 2032A(e)(8).

In Estate of Hughan, the parties agreed that the valuation was to be governed by the method of valuation described in section 2032A(e)(8). In Estate of Strickland v. Commissioner, 92 T.C. at 33 n.12, we stated that "If sec. 2032A(e)(8) is used for valuation purposes, none of the documentation requirements of sec. 2032A(e)(7)(A) would be required."[21] Valuation disputes under section 2032A(e)(8) will be settled or litigated in a manner similar to that used in valuation disputes under section 2031. See Estate of Hughan v. Commissioner, supra; sec. 20.2031-1(b), Estate Tax Regs. ("All relevant facts and elements of value as of the applicable valuation date shall be considered in every case.").

In contrast to Estate of Hughan, and as discussed in detail above, respondent did not apply section 20.2032A-4(b)(2)(i), Estate Tax Regs., and set the stage for a valuation dispute under

---

[21] In Estate of Hughan v. Commissioner, T.C. Memo. 1991-275, documentation with respect to the sec. 2032A(e)(8) valuation was presented and relied upon after the notice of election was filed. For example, the expert witness reports bearing on the farmland's value under sec. 2032A(e)(8) that were introduced into evidence at trial were dated between 2 and 4 weeks prior to the date of trial.

section 2032A(e)(8). Respondent ignored the automatic election provision in section 20.2032A-4(b)(2)(i), Estate Tax Regs., and never notified petitioner of any defects in its special use valuation election under section 2032A(e)(8). Respondent's determination in the notice of deficiency was that petitioner failed to make an effective and timely election under the provisions of section 2032A. That rationale was based on petitioner's failure properly to document comparable properties meeting the requirements of section 2032A(e)(7) and the regulations thereunder. The failure to document rentals of comparable properties meeting the requirements of section 20.2032A-4, Estate Tax Regs., precludes valuing the properties under section 2032A(e)(7). As discussed above, however, that failure does not make an otherwise valid election under section 2032A(e)(8) ineffective. See sec. 20.2032A-4(b)(2)(i), Estate Tax Regs.; see also Estate of Hughan v. Commissioner, supra.

Having failed to persuade us that petitioner made no election under section 2032A(e)(8), respondent now seeks to invalidate the election by pointing out that petitioner did not introduce evidence on all the required factors set forth in section 2032A(e)(8). We do not agree with this criticism of petitioner's election.

Respondent's principal arguments before the submission of his posttrial briefs were threefold:

(1) Petitioner failed to satisfy the requirements of section 2032A(e)(7) and section 20.2032A-4, Estate Tax Regs.;

(2) petitioner failed to elect special use valuation under section 2032A(e)(8); and

(3) even if petitioner is deemed to have elected special use valuation under section 2032A(e)(8), petitioner failed to comply substantially with its requirements at the time its election was made and therefore was not entitled to notice and an opportunity to cure under section 2032A(d)(3).

In respondent's posttrial brief, respondent now concedes that substantial compliance is no longer an issue but asserts a new argument, that petitioner has not met the requirements of section 2032A(e)(8) because petitioner has not introduced evidence on each of the five factors.

We reject respondent's substantive challenge to petitioner's section 2032A(e)(8) election because respondent failed to give petitioner the notice and opportunity to cure its election under section 2032A(e)(8) as required by section 2032A(d)(3). Section 2032A(d)(3) requires the Commissioner to prescribe procedures to ensure that (1) an electing estate is given notice of defects in its special use election and (2) an estate is given the opportunity to cure a defective election by providing missing information. Although the Commissioner has not yet prescribed the procedures required by section 2032A(d)(3), the Commissioner

nevertheless has taken the position administratively that the required notice and opportunity to cure must be given. The Commissioner's position is consistent with our own view of section 2032A(d)(3). See Estate of McAlpine v. Commissioner, 96 T.C. at 144, in which we stated with respect to section 2032A(d)(3) and section 20.2032A-8, Estate Tax Regs., that "The fact that the regulation does not contain a provision permitting perfection within 90 days does not, and cannot, nullify the provision permitting perfection in section 2032A(d)(3)."[22]

In this case, respondent gave the required notice and opportunity to cure to petitioner but only with respect to petitioner's election under section 2032A(e)(7). Respondent provided no notice of any alleged defects with respect to petitioner's election under section 2032A(e)(8) and no opportunity to cure the defects within the intendment of section 2032A(d)(3). The first and only notice of a substantive problem with petitioner's election under section 2032A(e)(8) was provided in respondent's posttrial brief.

---

[22]In general, when Congress requires the Secretary to prescribe regulations implementing taxpayer-friendly statutory provisions and the Secretary has not yet acted, this Court has held that the statute's operation is not conditioned upon the issuance of regulations. See Hillman v. Commissioner, 114 T.C. 103, 111-112 (2000); Estate of Maddox v. Commissioner, 93 T.C. 228, 233-234 (1989); First Chicago Corp. v. Commissioner, 88 T.C. 663, 676-677 (1987), affd. 842 F.2d 180 (7th Cir. 1988); Occidental Petroleum Corp. v. Commissioner, 82 T.C. 819, 829 (1984).

To satisfy the requirements of section 2032A(d), respondent must give some meaningful notice of alleged defects and provide petitioner with the opportunity to cure the defects identified in the notice <u>before</u> respondent can rely on the defects to invalidate petitioner's election.  The notice given by respondent to petitioner before the commencement of this case dealt only with petitioner's election under section 2032A(e)(7).  While adequate with respect to petitioner's election under section 2032A(e)(7), the notice was neither meaningful nor adequate with respect to petitioner's election under section 2032A(e)(8) and section 20.2032A-4(b)(2)(i), Estate Tax Regs.

By amending and broadening the scope of section 2032A(d) on several occasions,[23] Congress has demonstrated its intent to make the benefits of section 2032A available to deserving estates. See <u>Estate of Sequeira v. Commissioner</u>, T.C. Memo. 1995-450. This intent is evidenced by the elimination of the substantial compliance requirement in section 2032A(d)(3) and by Congress' continuing direction to the Commissioner to prescribe procedures by which an estate must be notified of alleged defects in its special use valuation election and given an opportunity to cure the defects.  See sec. 2032A(d)(3).

_____

[23]See Taxpayer Relief Act of 1997, Pub. L. 105-34, sec. 1313(a), 111 Stat. 1045; Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 1025(a), 98 Stat. 1030; Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 421(j)(3), 95 Stat. 313.

In this case, petitioner had no notice that respondent was challenging the adequacy of petitioner's election under section 2032A(e)(8) (as opposed to whether petitioner had elected special use valuation under section 2032A(e)(8)) before the filing of respondent's posttrial brief. When respondent's estate tax auditor, Ms. Hiles, informed petitioner that its special use valuation election was being disallowed, she provided information that was pertinent only to section 2032A(e)(7). She did not provide information on how petitioner could satisfy the requirements of section 2032A(e)(8). The notice of deficiency was equally uninformative with respect to the section 2032A(e)(8) requirements, merely stating that petitioner had failed to make an effective and timely election to value the properties in accordance with the provisions of section 2032A. At no point before the filing of respondent's posttrial brief was petitioner given any notice that respondent intended to raise the requirements of section 2032A(e)(8) as a bar to petitioner's election. Until his posttrial brief was filed, respondent argued only that petitioner had not made any election under section 2032A(e)(8); respondent did not contend that the election, if made, was inadequate. Since respondent did not give any notice to petitioner regarding his challenge to petitioner's special use valuation under section 2032A(e)(8) on its merits until respondent's posttrial brief was filed, petitioner had no notice

before trial of the alleged defects in its election and should not now be criticized for its failure to anticipate and deal with respondent's concerns at trial.

We conclude that when it enacted and amended section 2032A(d)(3), Congress intended for estates to have a realistic opportunity to correct defective special use valuation elections. We hold that respondent's incomplete notice under section 2032A(d)(3) deprived petitioner of the opportunity to correct its allegedly defective election under section 2032A(e)(8) and precludes respondent from raising the requirements of section 2032A(e)(8) as a bar to petitioner's election. To hold otherwise would be tantamount to writing section 2032A(d)(3) out of the statute or making respondent's obligation to adhere to its provisions optional.

We uphold petitioner's section 2032A election and hold that petitioner is entitled to a reduction in the aggregate fair market value of the qualified real property in the amount of $750,000, the maximum reduction in value allowed by section 2032A(a)(2).

V. Conclusion

We have carefully considered the remaining arguments of both parties for results contrary to those expressed herein, and, to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing and concessions by both parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.