UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Argued:    November 20, 2008                    Decided:    August 9, 2010)

Docket No. 07-5370-ag

_____

ESTATE of MARGOT STEWART, Deceased
BRANDON STEWART, Executor

*Petitioner-Appellant*,

v.

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

_____

Before: McLAUGHLIN, CALABRESI, and LIVINGSTON, *Circuit Judges.*

_____

Appeal from a judgment of the United States Tax Court holding that a 49% interest in a five-story New York house was includible in Margot Stewart's gross estate pursuant to 26 U.S.C. § 2036, and finding a $398,857.00 estate tax deficiency for the year 2000. We VACATE the judgment below and REMAND this case to the Tax Court. Judge Livingston dissents in a separate opinion.

> JENNIFER S. SMITH (Jerry D. Bernstein, *on the brief*), Blank Rome LLP, New York, N.Y., *for Petitioner-Appellant.*
>
> RANDOLPH L. HUTTER (Jonathan S. Cohen, *on the brief*) for Nathan J. Hochman, Assistant Attorney General, Tax Division,

U.S. Department of Justice, Washington, D.C., *for Respondent-Appellee.*

_____

CALABRESI, *Circuit Judge*:

Decedent, Margot Stewart, gave a 49% share of a mixed-use building to her son Brandon Stewart ("Brandon"). Upon Margot Stewart's death, the Internal Revenue Service sought to include this gift in Margot Stewart's estate under 26 U.S.C. § 2036(a)(1), reasoning that Margot Stewart had "retained for [her] life . . . the possession or enjoyment of, or the right to the income from the property." The Tax Court, T.C. Memo 2006-225, 92 T.C.M. (CCH) 357, agreed. Petitioner-Appellant Estate of Margot Stewart (the "Estate") appeals that decision, arguing that Decedent did not retain a lifetime interest in the 49% share and that there was no implied agreement that Decedent would retain enjoyment of the 49% share. The Commissioner contends that the Tax Court's decision was correct. We do not disturb the Tax Court's finding that an implied agreement existed, but we hold that the Tax Court clearly erred in finding that the terms of the implied agreement provided that Decedent would retain enjoyment of the entire 49% share, and that the entire property should remain in the Estate. We therefore VACATE the judgment below and REMAND this case for further proceedings consistent with this opinion.

**Facts**

**I.     The Two Properties**

Since 1989, Decedent Margot Stewart and her adult son Brandon Stewart co-owned, as joint tenants with rights of survivorship, a house in East Hampton, New York (the "East

2

Hampton property"). Each summer, Decedent and Brandon rented out the East Hampton property, splitting the rental income evenly. As a matter of expediency and convenience, Decedent and Brandon would not both sign the lease; nor would they ask the summer tenant to send two different rent checks, one to Decedent and one to Brandon. Rather, in different years, either Decedent or Brandon would sign the lease to rent out the property, and the tenant would write a single check either to Decedent or to Brandon. Whoever received the rent checks that year would then, every few months, write a check to the other for that person's share. Decedent and Brandon also split evenly the expenses of maintaining the East Hampton property. The result was that every summer each of Decedent and Brandon received half of the East Hampton property's net income.

At all times relevant to this appeal, Decedent and Brandon lived on the first two floors of a five-story brownstone in Manhattan (the "Manhattan property"), which Decedent had bought in 1968. On October 1, 1999, Decedent leased the upper three floors to an unrelated commercial tenant, Financial Solutions, Ltd. ("Financial Solutions"). The rent was $9,000 per month, and the term ran through July 31, 2002.

**II.     The Gift**

On October 1, 1999, Decedent and Brandon met with Attorney Frederick Walker, an estate planning specialist, for the purpose of reviewing the Financial Solutions lease. According to Walker's testimony, Decedent asked him what to do about the appreciation in the value of the Manhattan property, and Walker suggested that Decedent make a gift of part of the Manhattan property to Brandon. Decedent then said that she wanted to give Brandon half of the Manhattan property along with half of the rent. This account is corroborated by Walker's contemporaneous

3

diary, which says that Decedent wanted "to give son one-half of building and rent." Walker, Decedent, and Brandon met again the next day so that Decedent and Brandon could pick up the lease and further discuss the gift possibility with Walker.

Decedent was diagnosed with pancreatic cancer in December 1999, and she began chemotherapy treatments in January 2000. On May 9, 2000, Decedent and Brandon signed a deed that transferred a 49% interest in the Manhattan Property to Brandon.[1] The deed provided that Decedent and Brandon would be tenants in common.

**III.     After the Gift**

After the gift was completed, Decedent and Brandon continued to live together in the lower two floors of the Manhattan property. Financial Solutions continued to rent the upper three floors, but its rent payments were erratic, untimely, and sometimes partial.[2] In addition, according to Brandon's testimony (which is corroborated by financial documentation), the Manhattan property underwent thousands of dollars worth of repairs. As a result, the Manhattan

---

[1] Below, the Commissioner argued that the gift was not completed until after Decedent's death, because the deed had not yet been recorded. The Tax Court rejected this argument, *Estate of Stewart*, 2006 Tax Ct. Memo LEXIS 230, at *3-*4, and the Commissioner does not cross-appeal that determination. Accordingly, for our purposes, the transfer of the 49% interest in the Manhattan property occurred on May 9, 2000.

[2] Eventually, on or about August 30, 2001, Financial Solutions defaulted on the lease and was evicted.

property expenses were significantly higher than usual, at the same time that the income produced by the property became unreliable.

Against this backdrop, the financial relationship between Decedent and Brandon underwent several significant changes during the period after the gift and before Decedent's death.[3] While Decedent continued to receive the Manhattan property rent payments from Financial Solutions, Brandon received the rent payments from the tenant in the East Hampton property. In contrast to their previous practice, Brandon never wrote a check to Decedent for her share of the East Hampton rent. Decedent, who had previously paid for all Manhattan property expenses, now paid for most of them, with Brandon paying a small but not insignificant fraction. The Tax Court found that Decedent paid Manhattan property expenses of $21,790.85, while Brandon paid Manhattan expenses of $1,963. The record supports these findings; every one of these payments is accounted for in Brandon's and Decedent's bank statements, and the numbers add up.

**IV. Decedent's Death and Tax Consequences**

---

[3] Brandon testified that he and Decedent made an oral agreement to reconcile the income and expenses from the Manhattan Property and the East Hampton property. He also testified that after May 9, 2000, he spent twice as much time managing the Manhattan property tenant and repairs as he previously had. We will disregard this testimony because the Tax Court found it "not credible," and there is no basis for us to disturb this credibility determination on appeal. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985); *Ceraso v. Motiva Enterps., LLC*, 326 F.3d 303, 316-17 (2d Cir. 2003).

Margot Stewart died on November 27, 2000. Following her death, the estate filed with the IRS a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, which reported the contents of Margot's estate as including 100% of the East Hampton property[4] but only a 51% interest in the Manhattan property. On December 22, 2004, the IRS issued a notice of deficiency stating, *inter alia*, that Margot had retained possession or enjoyment of the transferred 49% interest and that therefore, under 26 U.S.C. § 2036, the entire Manhattan property was part of her estate for federal tax purposes.

The Estate filed a timely petition in the Tax Court challenging the IRS's determination of deficiency. The Tax Court held a two-day trial in June 2006. At trial, the Estate argued that, contrary to the IRS's contention, Decedent had not retained the enjoyment or income of the entire Manhattan property but rather, as a 51% owner, had forgone much of the net income from the top three floors by using a setoff to pay Brandon, and had shared the value of the bottom two by living with Brandon. According to the Estate, instead of splitting up the rental income and expenses each month in proportion to their interests in the two properties—a process which would have required Decedent and Brandon to write separate checks for every expense and receive separate checks from both tenants—Decedent and Brandon were keeping track of each person's net income from both properties and intended to reconcile any differences at the end of the year.

---

[4] While Decedent had owned the East Hampton property jointly with Brandon since 1989, she still owed estate tax on 100% of its value because it was held jointly with right of survivorship. *See* 26 U.S.C. § 2040(a).

The Tax Court issued a memorandum opinion denying the petition. T.C. Memo 2006-225, 92 T.C.M. (CCH) 357, 2006 Tax Ct. Memo LEXIS 230. The court found that Decedent "continued to receive the $9,000 monthly rent payments from Financial Solutions, Ltd., and enjoy the economic benefits of the [Manhattan] property." *Id.* at *6. The court described Decedent's "retention of the property's income stream after the property was transferred" as "very clear evidence that the decedent did indeed retain 'possession or enjoyment.'" *Id.* Because there was no written agreement between Decedent and Brandon stating that they would reconcile the income and expenses of the two properties and because the Tax Court did not credit Brandon's testimony that there was an oral agreement, the court found that no such agreement existed. *Id.* at *7. Rather, the Tax Court concluded that Brandon and Decedent "had an implied agreement that decedent would retain the economic benefits of the [Manhattan] property" and that "Decedent certainly met the terms of that agreement." *Id.* For those reasons the Tax Court held that the full value of the Manhattan property was includible in the Estate under 26 U.S.C. § 2036. The Estate timely appealed to this Court.

**Discussion**

I. **Legal Framework**

The Internal Revenue Code imposes a federal tax on "the taxable estate of every decedent who is a citizen or resident of the United States." 26 U.S.C. § 2001(a). A "taxable estate" is defined as "the value of the gross estate," less applicable deductions, *id.* § 2051, where the value of the gross estate includes "the value of all property to the extent of the interest therein of the decedent at the time of his death," *id.* § 2033. Some taxpayers use

7

various planning techniques designed to take property out of the gross estate or decrease its value. The IRS has several statutory tools to use in fighting these techniques. One of these tools—26 U.S.C. § 2036(a)(1)—is at issue here.

**A.      Section 2036(a)(1)**

Under Internal Revenue Code § 2036, the value of the gross estate includes "the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer . . . under which he has retained for his life . . . the possession or enjoyment of, or the right to the income from, the property." 26 U.S.C. § 2036(a), (a)(1). The purpose of § 2036 is to prevent individuals from using a gift transfer of property with reservation of a life estate—or any similar device—in order to avoid having to pay the estate tax. *See Comm'r v. Estate of Church*, 335 U.S. 632, 639-42 (1949). Absent § 2036, a decedent could transfer to her heir the remainder in a property while retaining a life estate, and the economic result would be substantially identical to what would have occurred if the decedent had left the property to the heir in her will under an irrevocable contract so to do. By including such property in the gross estate, § 2036 closes what would otherwise be—and at one time was— an enormous loophole in the estate tax.[5] *Id.*

Retention of a formal life estate in a property is just one method a taxpayer might use to try to avoid paying the estate tax while achieving, in substance, the same economic result as would occur if she retained the property for life and only disposed of it by will. Another method is to make an agreement (even an implied or unenforceable agreement) between a

---

[5] The reason the loophole was so significant when § 2036 was enacted was that at that time taxes on gifts were significantly lower than taxes on property transferred in an estate. *See* Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates and Gifts ¶ 126.4.1.

decedent and an *inter vivos* transferee that the decedent will continue to enjoy the benefits of the property for her life.  Not surprisingly, the courts and the IRS have ruled that if there is such an agreement, then the decedent is understood to have retained the possession or enjoyment of that property and the property must be included in the gross estate.  *See* 26 C.F.R. § 20.2036-1(c); *Estate of Maxwell v. Comm'r,* 3 F.3d 591, 593-94 (2d Cir. 1993).

In the case before us, the Tax Court found as a fact that when Decedent gave a 49% share of the Manhattan property to Brandon, she did so with an implied agreement that she "would retain the economic benefits" of the whole townhouse.  If, as the Tax Court held, Decedent retained the possession or enjoyment of the 49% share of the property that she had given to Brandon, it followed under 26 U.S.C. § 2036(a)(1) that the 49% share was part of the Estate.

### B.    The Planning Technique in This Case

Today, unlike when § 2036 was enacted, *see supra* note 5, the estate tax and the gift tax are on a unified rate schedule.[6]  And, presumably, Decedent owed a gift tax as of the time she transferred the 49% interest in the Manhattan property.  *See* J.A. 334 (noting that the Estate filed a gift tax return for this transfer).  Why, then, does it matter whether the Estate pays estate tax or gift tax on the transferred 49% interest?  Part of the answer is that the Commissioner wants to tax the appreciation of Brandon's share of the Manhattan property during the roughly 6-month period from the date of the transfer to the date of Decedent's

---

[6] As the Joint Committee on Taxation explained the law applicable in 2000: "The gift tax and the estate tax are unified so that a single graduated rate schedule applies to cumulative taxable transfers made by a taxpayer during his or her lifetime and at death."  Joint Committee on Taxation, *Description of "The Death Tax Elimination Act of 2000" (H.R. 8)* (JCX-51-00), May 23, 2000, at 2.

9

death. But the appreciation of the entire Manhattan property during that period was stipulated to be $125,000, J.A. 71, and the tax applicable to Brandon's 49% share of that appreciation, though not trivial, would probably not be an unduly large amount of money.[7]

Estate planners have, however, found a highly effective way to lower both estate and gift taxes when passing real estate to the next generation. Dividing the real estate into separate interests usually lowers the property's fair market value and thereby also the taxes due on it.[8] *See* David Westfall et al., Estate Planning Law & Taxation ¶ 2.05[3] (2009). The fair market value of separate interests is typically discounted by about 10-20% for lack of control and marketability. *Id.* In the instant case, however, the parties stipulated to a much higher discount

---

[7] Indeed, in 1981 when Congress modified the closely related statute 26 U.S.C. § 2035(a), which had previously provided that most transfers within three years of death had to be included in the gross estate, *see* 26 U.S.C. § 2035(a) (1980), the Senate Finance Committee stated:

> The committee generally does not believe it appropriate to tax appreciation that accrues after a gift has been made under the unified estate and gift taxes merely because the donor died within 3 years of the gift. The present rule often results in needless administrative burdens in valuing property twice.

S. Rep. No. 97-144, at 138 (1981), *reprinted in* 1981 U.S.C.C.A.N. 105, 238-39.

[8] This technique works because the estate tax is imposed on the fair market value of property, not on the value of the property to the person inheriting it—even if the latter amount is much greater because the heir owns a complementary asset such as the other part of the two divided interests in a parcel of real property. As the Treasury Regulations explain:

> The value of every item of property includible in a decedent's gross estate under sections 2031 through 2044 is its fair market value at the time of the decedent's death . . . . The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.

26 C.F.R. § 20.2031-1(b); *see also Propstra v. United States*, 680 F.2d 1248, 1251-52 (9th Cir. 1982) ("[W]e see good reason to consider the 'willing seller' mentioned in Treas. Reg. § 20.2031-1(b) as a hypothetical seller rather than the estate or any of decedent's beneficiaries. . . . Executors will not have to make delicate inquiries into the feelings, attitudes, and anticipated behavior of those holding undivided interests in the property in question.").

of 42.5% if the property had in fact been divided.[9] J.A. 71-72. That discount is responsible for the lion's share of the money at stake in this case. It is for this reason that the Commissioner wants us to hold that the entirety of Brandon's 49% interest is part of Decedent's gross estate. The Estate would then be taxed as though Decedent, instead of giving Brandon 49% of the Manhattan property on May 9, 2000, had owned the whole property until her death on November 27, 2000. And there then would be no 42.5% discount for lack of control and marketability.

**II.     Continued Possession or Enjoyment**

The Tax Court concluded that Decedent "retained . . . the possession or enjoyment of, or the right to the income from, the property." 26 U.S.C. § 2036(a), (a)(1). "The general characterization of a transaction for tax purposes is a question of law" subject to *de novo* review. *Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n.16 (1978). We must therefore determine what it means, in the context before us, to "retain[] . . . the possession or enjoyment of, or the right to the income from, the property."

As an initial matter, we note that two aspects of this statute, as applied to this case, are beyond reasonable dispute. First, Decedent did not retain "the right to income from[] the property." Retaining the *right* to income is not the same as retaining the income. As the Supreme Court has explained in interpreting § 2036(a)(2), "[t]he term 'right,' certainly when used in a tax statute, must be given its normal and customary meaning. It connotes an ascertainable and legally enforceable power . . . ." *United States v. Byrum*, 408 U.S. 125, 136 (1972). It is undisputed that Decedent did not have a legally enforceable power to receive the

---

[9] We express no view whether the 42.5% discount is a correct figure, or whether on remand the Government remains bound by its stipulation.

income from the interest in the Manhattan property that she had legally transferred to Brandon. Therefore, if Decedent "retained" anything described in § 2036(a)(1), it was the actual "possession or enjoyment" of Brandon's 49% interest, and not any "right to income from" it. Second, "the property" in § 2036(a)(1) here refers to the transferred 49% interest in the Manhattan property, not to the entire Manhattan property. The Tax Court has previously recognized that a decedent's formal and substantial retention of a majority interest in real property does not necessarily require a finding that the decedent retained possession of a transferred minority interest, *see, e.g.*, *Estate of Wineman v. Comm'r*, T.C. Memo 2000-193, 79 T.C.M. (CCH) 2189, 2000 Tax Ct. Memo LEXIS 233, at *24-25, and we agree. Therefore, our inquiry is limited to whether Decedent "retained . . . the possession or enjoyment of" the transferred 49% interest in the Manhattan property.

In applying the "possession or enjoyment" language of § 2036 "we look to substance, not to form." *Estate of Church*, 335 U.S. at 644 (quoting *Helvering v. Hallock*, 309 U.S. 106, 114 (1940)). "It is well settled that the terms 'enjoy' and 'enjoyment,' as used in various estate tax statutes, 'are not terms of art, but connote substantial present economic benefit rather than technical vesting of title or estates.'" *Byrum*, 408 U.S. at 145 (quoting *Comm'r v. Estate of Holmes*, 326 U.S. 480, 486 (1946)). "In the case of real property, the terms 'possession' and 'enjoyment' have been interpreted to mean 'the lifetime use of the property.'" *Estate of Maxwell*, 3 F.3d at 593 (quoting *Byrum*, 408 U.S. at 147)). While it may sometimes be difficult to determine who is using real property that is wholly inhabited by a decedent and/or family members, it is quite easy to determine who is using real property that is producing income. All we have to do is follow the money. Whoever is, in substance,

receiving the net income (or taking the net loss) from the property, is using it during his or her lifetime, and thus possessing and enjoying the property. *See Estate of McNichol v. Comm'r*, 265 F.2d 667, 671 (3d Cir. 1959); *see also* 26 C.F.R. § 20.2036-1(b)(2) ("The 'use, possession, right to the income, or other enjoyment of the transferred property' is considered as having been retained or reserved to the decedent to the extent that the use, possession, right to the income, or other enjoyment is to be applied toward the discharge of a legal obligation of the decedent, or otherwise for his pecuniary benefit.").

Under the applicable Treasury Regulations, however, a finding of "retained . . . possession or enjoyment" is not the end of the matter. The *extent* of the retained possession or enjoyment must also be determined.

> If the decedent retained or reserved an interest or right with respect to all of the property transferred by him, the amount to be included in his gross estate under section 2036 is the value of the entire property, less only the value of any outstanding income interest which is not subject to the decedent's interest or right and which is actually being enjoyed by another person at the time of the decedent's death. *If the decedent retained or reserved an interest or right with respect to a part only of the property transferred by him, the amount to be included in his gross estate under section 2036 is only a corresponding proportion of the amount described in the preceding sentence.* An interest or right is treated as having been retained or reserved if at the time of the transfer there was an understanding, express, or implied, that the interest or right would later be conferred.

26 C.F.R. § 20.2036-1(c)(1)(i) (emphasis added). This position is also the official position of the IRS, as well as at least one other circuit court. *See* Rev. Rul. 79-109, 1979-1 C.B. 297 ("[W]hen a decedent retained an interest in only a part of the transferred property, or, in the alternative, in a corresponding portion of the income produced by the property, the amount includible in the gross estate is that portion of the transferred property that would be necessary

13

to yield the retained income."); *see also In re Estate of Uhl*, 241 F.2d 867, 870-71 (7th Cir. 1957).

As discussed earlier, one way a decedent can retain possession or enjoyment of a property is through an implied agreement. Under 26 C.F.R. § 20.2036-1(c), however, the existence or nonexistence of an implied agreement is not enough to resolve this case. The *terms* of the agreement also matter. If, for example, the facts were to indicate that, pursuant to an implied agreement, Decedent had retained 80% of the substantial present economic benefit of the transferred 49% interest in the Manhattan property, then only the "corresponding proportion" of the value of the entire 49% interest would be included in the Estate.

## III. Implied Agreement

We now turn to the Tax Court's findings of fact. The Tax Court found that there was an "implied agreement" that Margot Stewart "would retain the economic benefits" of the entire transferred interest in the Manhattan property.[10] Whether there was such an implied agreement, and what its terms were, are questions of fact that we review for clear error. *Estate of Maxwell*, 3 F.3d at 594; *see also Frank Lyon Co.*, 435 U.S. at 581 n.16 ("The general characterization of a transaction for tax purposes is a question of law subject to [*de novo*] review. The particular facts from which the characterization is to be made are not so subject."). When deciding whether there was an *implied* agreement, some amount of inference is necessary. In order to make such an inference "all facts and circumstances

---

[10] If § 2036 applies in this case, it must be because there was an implied agreement of this sort, for it is undisputed that there was no express agreement, such as a retained life estate or a contract stating that Decedent would continue to receive the entire net income from the Manhattan property.

surrounding the transfer and subsequent use of the property must be considered." *Estate of Rapelje v. Comm'r*, 73 T.C. 82, 86 (1979); *accord Estate of Abraham v. Comm'r*, 408 F.3d 26, 39 (1st Cir. 2005); *see also* 26 C.F.R. § 20.2036-1. "[T]he burden is on the decedent's estate to disprove the existence of any adverse implied agreement or understanding and 'that burden is particularly onerous when intrafamily arrangements are involved.'" *Estate of Maxwell*, 3 F.3d at 594 (quoting *Estate of Rapelje*, 73 T.C. at 86). Because the Manhattan property was used partly as a residence and partly as an income-producing rental property, we shall consider whether the facts and circumstances surrounding either of these uses indicated an implied agreement, and if so, what the terms of that agreement were.

### A. Residential Use

The Tax Court did not rely on Decedent's continued residence in the Manhattan property for its finding that an implied agreement existed. *See Estate of Stewart*, 2006 Tax Ct. Memo LEXIS 230, at *5-*7. But the Commissioner seems to rely on it in part. We, however, do not believe that the terms of any implied agreement can be read to provide that Decedent would retain enjoyment of the *residential* portion of Brandon's 49% interest in the Manhattan property.

In residential transfer cases, "[i]n determining whether an implied agreement or understanding existed between the parties . . . . the courts have found two factors to be particularly significant: continued exclusive possession by the donor and the withholding of possession from the donee." *Estate of Spruill v. Comm'r*, 88 T.C. 1197, 1225 (1987); *accord Guynn v. United States*, 437 F.2d 1148, 1150 (4th Cir. 1971). The presence of both those factors is so damning that in cases where a decedent transfers a residential property but

15

continues to live in it to the exclusion of the donee, the estate taxpayer has lost in every case of which we are aware because the taxpayer could not meet its burden.[11]  And, if Brandon had not lived in the Manhattan property for the entire time between the transfer and Decedent's death, it would certainly not have been clear error had the Tax Court found an implied agreement that Decedent could have excluded Brandon from the Manhattan property during her life, and thereby had enjoyed the benefits of the residential part of his 49% interest and of his rights as a residential tenant in common.

In this case, however, neither of the two factors stated in *Spruill* is present.  Decedent did not have exclusive possession of, nor did she exclude Brandon from, Brandon's 49% interest in the Manhattan property—or, for that matter, the entire property.  Like other courts, we draw a distinction between cases where a decedent retains exclusive possession and withholds possession from the donee on the one hand, and "those cases where a residence jointly occupied by the donor and the donee has been held not includable in the donor's gross estate," *Guynn*, 437 F.2d at 1150, on the other.  This case is of the latter sort.  And despite the great burden faced by the taxpayer in all these cases, taxpayers have *won* in every case of which we are aware when those two crucial factors were favorable.[12]  In these cases a

---

[11] *See, e.g.*, *Estate of Maxwell*, 3 F.3d at 592, 595; *Estate of Reichardt v. Comm'r*, 114 T.C. 144, 152-55 (2000); *Estate of Kerdolff v. Comm'r*, 57 T.C. 643, 648-49 (1972); *Estate of Linderme v. Comm'r*, 52 T.C. 305, 308-10 (1969).  The same result occurs when the decedent's occupancy of the transferred property is "almost exclusive" of the donee.  *See Estate of Rapelje*, 73 T.C. at 86-88.

[12] *See, e.g.*, *Union Planters Nat'l Bank v. United States*, 361 F.2d 662, 666 (6th Cir. 1966); *Estate of Binkley v. United States*, 358 F.2d 639, 640 (3d Cir. 1966) (per curiam); *Diehl v. United States*, 21 A.F.T.R.2d 1607, 1608 (W.D. Tenn. 1967); *Stephenson v. United States*, 238 F. Supp. 660, 667 (W.D. Va. 1965); *Estate of Roemer v. Comm'r*, T.C. Memo 1983-509, 46 T.C.M. (CCH) 1176, 1983 Tax Ct. Memo LEXIS 281, at *6-*12 (1983); *Estate of Gutchess v.*

transferor's "use of the property by occupancy after the transfer is a natural use which does not diminish [the] transferee['s] enjoyment and possession and which grows out of a congenial and happy family relationship." *Estate of Gutchess v. Comm'r*, 46 T.C. 554, 557 (1966).

Although co-occupancy of a residential premises by the related donor and donee is highly probative of the absence of an implied agreement and has repeatedly been held to satisfy the taxpayer's burden, we need not and do not hold that that fact alone will always carry the burden as a matter of law. In some future case, a finding of an implied agreement between related co-occupants of residential real property might not be clearly erroneous. But where, as here, the Tax Court has made no specific findings relating to enjoyment of the residential portion of the property, and the Commissioner points to nothing besides the mere co-occupancy between the donor and the donee, a conclusion based on an implied agreement concerning the residential portion cannot stand.[13] As a result, Decedent's residential use of

---

*Comm'r*, 46 T.C. 554, 556-57 (1966); *Estate of Wier v. Comm'r*, 17 T.C. 409, 420-22 (1951); *Estate of Burr v. Comm'r*, 4 T.C.M. (CCH) 1054, 1945 Tax Ct. Memo LEXIS 33, at *36 (1945). One might attempt to distinguish these cases on the ground that many of them involved interspousal transfers. We are aware of only two cases—*Diehl* and *Estate of Roemer*—involving familial, non-interspousal transfers in which the family member donee co-occupied the transferred property with the decedent for the entire time between the transfer and the decedent's death; and the taxpayer won in both these cases. In *Estate of Roemer*, moreover, the Tax Court expressly rejected a "spouses only" reading of the cases. *See Estate of Roemer*, 1983 Tax Ct. Memo LEXIS 281, at *9-10 (noting the use of the words "family relationship" instead of "marital relationship" in this line of cases, and holding that "the logic employed is not limited merely to interspousal transfers"). We agree with the Tax Court.

[13] The dissent points to several factors which, it claims, support the conclusion that Decedent and Brandon had an implied agreement that Decedent would possess or enjoy the residential portion of the Manhattan property. The Tax Court, however, never made any finding to the effect that there was an implied agreement concerning the residential portion, let alone that the factors cited by the dissent support that conclusion. Instead, the Tax Court focused on "Decedent's retention of the property's income stream after the property was transferred."

17

*Estate of Stewart*, 2006 Tax Ct. Memo LEXIS 230, at \*6**.**

Even if the Tax Court had intended to be the first court ever to find an implied agreement between related co-occupants, the facts referred to by the dissent would not persuade us. First, the dissent seems to suggest that a decedent's retention of a partial interest as a tenant in common is similar to retention of a life estate, and attempts to distinguish on that ground the numerous cases involving complete transfers of residential property followed by co-occupancy. *See post*, at **[8-10]** & n.1. It seems to us, however, that it would be bizarre to hold that a decedent who retains a tenancy in common bears a *heavier* burden in disproving the existence of an implied agreement than does a decedent who gives away the entire property in fee simple and yet remains on the premises despite having no legal right to be there. Moreover, the dissent does not dispute our conclusion that, consistent with *Estate of Wineman*, a decedent's retention of a fractional interest in real estate, unlike a decedent's retention of a life estate, does not automatically result in the triggering of § 2036 over the whole property. That is, when § 2036(a)(1) refers to "the possession or enjoyment of, or the right to the income from, the property," in the case of a life estate, the words, "the property," refer to the entire property (and not just the transferred remainder). But, given *Estate of Wineman*, in the case of a tenancy in common, the same words refer only to the transferred interest. The test for an implied agreement, therefore, should be applied no more stringently in cases involving transfers of a fractional interest in real estate than in any other case involving any other type of "property." And those other cases do not, contrary to the dissent, *post*, at **[8]**, require us to focus only on what the transferor retained while ignoring what the transferee received. *See, e.g.*, *Estate of Gutchess*, 46 T.C. at 557 (noting the absence of "a withholding of use from the transferee" and stating that the transferor's continued use of real property "is a natural use which does not diminish transferee['s] . . . enjoyment and possession").

Second, the facts referred to by the dissent have not been held sufficient to support a finding of an implied agreement in other cases. The dissent notes initially that "Margot and Brandon Stewart amicably shared the residential property after their transfer, just as they had when Margot Stewart was sole owner." *Post*, at **[12]**. It is, of course, true that Decedent was not prevented from using any part of the residential portion of the property that she had used before the transfer, nor was there any other change in her use. But in other cases involving the absence of such a change, no § 2036 retention was found. *See*, *e.g.*, *Estate of Gutchess*, 46 T.C. at 554-55 (decedent and donee spouse lived together in residence for about 17 years before transfer and about 11 years thereafter). Secondly, the dissent points to the Tax Court's credibility finding. *Post*, at **[15-16]**. Yet all the Tax Court found was that Brandon's "testimony relating to an oral agreement" to offset Manhattan property income and expenses with East Hampton property income and expenses "was not credible." *Estate of Stewart*, 2006 Tax Ct. Memo LEXIS 230, at \*7. It does not follow from the absence of an offsetting agreement, or from the incredibility of that testimony, that there was an implied agreement that Decedent would retain enjoyment of the residential portion of the Manhattan property. Finally, the dissent relies on the Decedent's payment of a substantial majority of the Manhattan property expenses after the transfer. *Post*, at **[16-18]**. As noted in Part III.C of this opinion, substantial economic benefit is best determined by net income, rather than by gross income or gross expenses. In any event, a decedent's payment of all or substantially all gross expenses post-transfer has, in many cases, not resulted in

part of the Manhattan property does not indicate an implied agreement that she would to any extent retain the substantial economic benefits of the residential portion of Brandon's 49% interest.

**B.      Commercial Use**

It was, however, not clearly erroneous for the Tax Court to find an implied agreement that Decedent would enjoy for her life the substantial *economic* benefit of some part—indeed, perhaps all—of the rental portion of the Manhattan Property.  The Tax Court found that (1) "Decedent continued to receive the $9,000 monthly rent payments from Financial Solutions, Ltd.," and (2) Brandon's testimony was not credible.  *Estate of Stewart*, 2006 Tax Ct. Memo LEXIS 230, at *6-*7.  Those two findings are not clearly erroneous and must be upheld. Because the Estate has failed to provide a credible explanation as to why the entire rent payments went to Decedent, they support the Tax Court's finding of an implied agreement.

**C.      Apportionment**

For the reasons stated above, it was not clearly erroneous for the Tax Court to find an implied agreement, but it was clearly erroneous for the Tax Court to find that the terms of the agreement were such that Decedent would enjoy the substantial economic benefit of 100% of Brandon's 49% interest in the Manhattan property.  This is so because Brandon manifestly enjoyed, and Decedent did not, the benefits of the residential portion of the 49%.  And, as we

---

a finding of an implied agreement.  *See, e.g.*, *Estate of Roemer*, 1983 Tax Ct. Memo LEXIS at *4 (noting that, post-transfer, the decedent paid the maintenance, insurance, and utility bills for the residence, as well as some of the grocery bills and property taxes); *Stephenson*, 238 F. Supp. at 663 ("Decedent continued to pay the bills and to maintain the house . . . .").

discuss below, even as to the commercial portion it seems likely that Decedent retained the benefits of less than the total 49%.

The question that remains is, therefore, what part of the 49% interest should be included in the Estate. It is for the Tax Court in the first instance to make the findings necessary to answer that question. Because the Tax Court appears to have treated § 2036(a)(1) as an all-or-nothing matter and did not consider whether Decedent had "retained or reserved an interest or right with respect to a part only of the property transferred," 26 C.F.R. § 20.2036-1(c)(1)(i), the findings cited by the Tax Court—Decedent's receipt of the rental income and the credibility determination as to Brandon's testimony—do not provide a complete picture of the extent to which Decedent enjoyed the substantial economic benefit of Brandon's 49% interest during her life. And, because the Tax Court did not consider "all facts and circumstances surrounding the transfer and subsequent use of the property," *Estate of Rapelje*, 73 T.C. at 86, it is appropriate to vacate and remand so that the Tax Court may do so.

In determining the apportionment of Brandon's 49% interest, the Tax Court should use the approach adopted by the IRS in Rev. Rul. 79-109. In that ruling, a decedent conveyed to his adult children a vacation home, but he retained for his life the right to use it or, in the alternative, keep the rental payments, during the month of January each year. The Service explained that "the amount includible in the gross estate is that portion of the transferred property that would be necessary to yield the retained income." *Id.* The rental value of the property for January was $600, which was 13.3% of the $4500 the property produced

20

annually, and the Service therefore calculated that 13.3% of the value of the residence was to be included in the decedent's gross estate. *Id.*

The facts are more complicated in the instant case, but the basic principle is the same: the portion of the property to be included in the gross estate is the portion that would be necessary to produce the income Decedent retained. The Tax Court must first determine how much of the substantial economic benefit generated by the 49% interest is attributable to the residential portion of the interest and how much is attributable to the commercial portion. Such a finding is essential because, at least insofar as *gross* income is concerned, Decedent received 100% of the economic benefit from the commercial portion of the 49% transferred, by receiving the rent payments, while Brandon received 100% of the economic benefit from the residential portion of that 49% by inhabiting it.

The Tax Court should then examine a factual finding that it made, but seemingly failed to take fully into account. Between the transfer of the 49% interest and Decedent's death, Decedent paid Manhattan property expenses of $21,790.85,[14] and Brandon paid Manhattan

---

[14] The Estate claims that, in addition to the $21,790.85 in expenses the Tax Court found Decedent to have paid, Decedent paid real estate taxes on the Manhattan Property of $9,801.78 on November 24, 2000. Appellant's Br. at 15. That number also happens to be the exact difference between the sum of the expenses Appellants claim Decedent paid, and the amount the Tax Court found that she paid. *See* Appellant's Br. at 13-15. But the only support for the Estate's claim in the record is that a number that is supposed to be 51% of it is found in Decedent's estate tax return. J.A. 104. Nothing in Decedent's bank statement for that date indicates such a payment. J.A. 190, 195. The parties also stipulated that Decedent had paid estate taxes for the Manhattan property with a check written on or about July 5, 2000, J.A. 78, and Decedent's bank statement shows that such a payment was made, in the amount of $9,665.58. J.A. 150, 155. That amount, unlike the alleged November payment of $9,801.78, was included in the Tax Court's calculation of the total amount of Manhattan property expenses paid by Decedent. On this record, we cannot say that the Tax Court's finding of $21,790.85 was clearly erroneous.

21

property expenses of $1,963. *Estate of Stewart*, 2006 Tax Ct. Memo LEXIS 230, at *3. This finding is a double-edged sword. Payment of expenses attributable to a property is one of the indicia of ownership of that property, and Decedent paid most (but not all) of the expenses attributable to Brandon's 49% interest. As a result, the Tax Court's finding concerning expenses supports its finding that an implied agreement existed and hence the inclusion of a significant portion of the 49% interest in the Estate. But each dollar of Manhattan property expenses paid by Decedent also *decreases* the economic benefit she received. For example, if A and B jointly own a rental property that generates $10,000 per month in rent and $5,000 per month in expenses, and A and B split the rent evenly but B pays all the expenses, then in substance A is getting the entire economic benefit of the property while B is getting nothing. Because "'enjoyment' . . . connote[s] substantial present economic benefit," *Byrum*, 408 U.S. at 145 (internal quotation marks omitted), we think who paid what expenses must be taken into account in apportioning the 49% interest between the Estate and Brandon. In other words, the Tax Court must determine who received what portion of the *net* income from the 49% interest, rather than the *gross* income.[15]

Finally, the Tax Court apparently did not consider the distribution of the income and expenses from the East Hampton property at all. While the Tax Court was clearly under no obligation to credit Brandon's testimony that he and Decedent intended to use the East Hampton income to set off the Manhattan income and then reconcile their accounts at year's

---

[15] As used in the preceding sentence, "income" includes not only the dollars generated by the rental portion of the 49% interest in the Manhattan property (less, in the case of net income, the expenses attributable to the 49% interest), but also Brandon's imputed income from living in the residential portion of the property—that is, the fair market rental value one would have paid to be Decedent's housemate from May 9, 2000, to November 27, 2000.

22

end, it may be worth considering on remand where the net income from the East Hampton property went. Although the Commissioner argues that the reference to "the property" in § 2036(a)(1) "does not provide for consideration of the decedent's relationship to *other* property, regardless of its circumstantial association with the property at issue," Appellee's Br. at 22, we need not go that far. In some cases, consideration of other property may be useful to an accurate determination of who enjoyed the substantial economic benefit of a property. If, for example, Brandon and Decedent had formally split the rental income and costs of the Manhattan property 51%-49% but Brandon had allowed Decedent to take a portion of what should have been Brandon's net income from the East Hampton property, and that amount equaled the income Brandon was entitled to from his 49% share of the Manhattan property, then consideration of the East Hampton property would be necessary to prevent an abusive transaction that would otherwise evade § 2036. At the other extreme, if Brandon and Decedent had jointly owned hundreds of other properties and there was no particular reason to think that the distribution of income from those properties was in any way related to the substantial economic benefit of the disputed property, then it would be incorrect to consider such other properties. We leave it to the Tax Court to determine, on remand, where this case falls along that spectrum and whether the distribution of net income from the East Hampton property is among the "facts and circumstances surrounding the transfer and subsequent use of the property," all of which "must be considered," *Estate of Rapelje*, 73 T.C. at 86.[16]

---

[16] If the Tax Court does decide to consider the distribution of net income from the East Hampton property, then it will be necessary to make findings of fact as to the amount and distribution of the rental income and expenses from that property, and, on that, the Estate bears the burden of proof. *See Estate of Maxwell*, 3 F.3d at 594.

We also note that, depending on the amount and distribution of the *net* income from the

**IV.    Conclusion**

Because the Tax Court's finding that the terms of the implied agreement between Decedent and Brandon provided that Decedent would enjoy 100% of the substantial economic benefit of Brandon's 49% undivided interest in the Manhattan property was clearly erroneous, we vacate the judgment below and remand for further proceedings. Decedent "retained or reserved an interest . . . with respect to a part only of," 26 C.F.R. § 20.2036-1(c)(1)(i), Brandon's 49% stake in the Manhattan property, which is what she transferred. On remand, the Tax Court should make the factual determinations necessary to determine the amount of the net income from Brandon's 49% interest enjoyed by Decedent. Then the Tax Court can calculate the "corresponding proportion" of "the value of the entire property," and include it in the Decedent's gross estate under § 2036. *See* 26 C.F.R. § 20.2036-1(c)(1)(i).

We therefore VACATE the judgment below and REMAND this case for further proceedings consistent with this opinion.

---

East Hampton property, consideration of that information might turn out to be *unfavorable* to the Estate. The Estate's brief contains a chart suggesting that consideration of the East Hampton property would yield a roughly equal overall distribution between Brandon and Decedent of the net income from both properties. Appellant's Br. at 13-15. This chart, however, is inaccurate, not only because it includes the alleged real estate tax payment by Decedent noted *supra* at note 14, but also because it ignores the expenses of the East Hampton property at the same time as it takes the income from that property into account. If the East Hampton expenses were large and were disproportionately paid by Brandon, then consideration of the East Hampton property by the Tax Court might not result in more net income having gone to Brandon than if the Tax Court looked only at the Manhattan property.

LIVINGSTON, *Circuit Judge,* dissenting:

The majority concedes that the Tax Court properly concluded in this case that an implied agreement existed between the decedent, Margot Stewart, and her adult son, Brandon, that despite the transfer of a 49% share in her five-story Manhattan brownstone to Brandon during her lifetime, Margot Stewart would retain possession or enjoyment of at least some portion of this 49%, so that its value should be included in her gross estate. It would have been difficult for the majority to have done otherwise. The burden rested with Margot Stewart's estate to *disprove* the existence of such an agreement, and yet the undisputed facts tended, instead, to show it. Thus, after the transfer of the 49% share, Margot Stewart continued to live in the first two floors of the property with her son Brandon, just as she had before. Despite the transfer, she alone continued to receive the rental income paid by the tenants who leased the upper three floors for $9000 per month. And notwithstanding that Brandon Stewart formally owned 49% of the brownstone, it was Margot Stewart who continued to pay essentially all the expenses associated with the Manhattan property – over $21,000 in the period before her death, as compared to the nominal amount of $1963 contributed by Brandon.

To be sure, Brandon Stewart offered testimony that, if credited, would have vitiated the tendency of these undisputed facts to show that Margot

Stewart retained possession and enjoyment of the property during her lifetime. He swore that he and his mother had an oral agreement by which the income and expenses from the Manhattan property were to be reconciled with the income and expenses associated with an East Hampton property they jointly owned. If credited, this testimony would have established that Brandon Stewart was to receive the rental income associated with his 49% share and was to pay 49% of the brownstone's expenses. Brandon Stewart's accountant, however, could not recall being informed of such an arrangement. The Tax Court concluded that Brandon Stewart's testimony, simply put, "was not credible." The majority takes no issue with this conclusion.

In fact, the majority takes no issue with any of this. It nevertheless vacates the decision of the Tax Court including the full value of the Manhattan townhouse in the gross value of Margot Stewart's estate on the theory that even though an implied agreement existed, the Tax Court clearly erred in concluding that its terms were such that Margot Stewart retained possession or enjoyment of the entire 49% interest she had formally transferred – meaning, not only the income stream from the rent that was paid, but also the substantial economic benefits of residence. The majority does not – and cannot – explain how the Tax Court clearly erred as a factual matter in concluding that Margot Stewart retained all these benefits, given that her relationship to the property changed

in *not one significant respect* from the period preceding transfer to the period after. Instead, the majority, misreading a body of case law that primarily involves transfers of 100% of a family member's interest in a property to another family member, concludes that post-transfer co-occupancy is near-conclusive evidence that the transferor can no longer enjoy the substantial economic benefits of residence to the extent of the transferred interest. Indeed, the majority finds such co-occupancy dispositive even here, where the transfer concerned only a fraction of the transferor's interest, created a tenancy in common that guaranteed the transferor continued access to the entirety of her property, and involved a transferor and transferee who the majority agrees were found *correctly* by a court of law to have reached an agreement undercutting the economic substance of the very transfer under consideration.

This turns the proper – and longstanding – construction of section 2036 on its head. It also opens up a loophole that will vitiate to a considerable degree the efficacy of this section, in conjunction with the uniform rate schedule now applicable to estate and gift taxes, in ensuring that the estate and gift taxes are equitably imposed on all those subject to them. I respectfully dissent.

* * *

Section 2036 provides, in relevant part, as follows:

The value of the gross estate shall include the value of all property

3

> to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), . . . under which he has retained for his life . . . --
>
> (1) the possession or enjoyment of . . . the property . . . .

26 U.S.C. § 2036(a). As the foregoing makes clear, the focus of section 2036 is upon whether a transferor – whether by express or implied agreement – in substance has retained the possession or enjoyment of property following a transfer. *See Comm'r v. Estate of Church*, 335 U.S. 632, 644 (1949) (noting, in interpreting the predecessor statute to section 2036, that "we look to substance, not to form" in determining the effect of a transaction (quoting *Helvering v. Hallock*, 309 U.S. 106, 114 (1940))); *Estate of Thompson v. Comm'r*, 382 F.3d 367, 375-76 (3d Cir. 2004) (applying same principle to transactions under section 2036); *Glaser v. United States*, 306 F.2d 57, 61 (7th Cir. 1962) (same). As the majority notes, the purpose of this section is to ensure that taxpayers cannot avoid the estate tax via inter vivos transfers of property that are essentially testamentary, with the transferor retaining enjoyment of the property for her lifetime. *See Estate of Thompson*, 382 F.3d at 375 ("Section 2036 addresses the concern that inter vivos transfers often function as will substitutes . . . ." (citing *United States v. Estate of Grace*, 395 U.S. 316, 320 (1969))). An implied agreement that a decedent will continue in her possession or enjoyment of

4

property after a transfer is properly inferred from all the facts and circumstances surrounding the transfer and the property's subsequent use, *Estate of Rapelje v. Comm'r*, 73 T.C. 82, 86 (1979); *accord Estate of Abraham v. Comm'r*, 408 F.3d 26, 39 (1st Cir. 2005), and need not be legally enforceable, *Estate of Maxwell v. Comm'r*, 3 F.3d 591, 593 (2d Cir. 1993) (citing *Estate of Rapelje*, 73 T.C. at 86). Moreover, at least where the surrounding circumstances suggest the existence of an implied agreement that would trigger section 2036, the burden falls to the estate "to disprove the existence of any adverse implied agreement or understanding," *Estate of Maxwell*, 3 F.3d at 593-94, a burden that this Court has described as "particularly onerous" in the context of intrafamily transfers, *id.* at 594 (quoting *Rapelje*, 73 T.C. at 86).

As the foregoing suggests, and as the majority acknowledges, the Tax Court's conclusions in this case regarding the implied agreement between Margot and Brandon Stewart are factual determinations reviewable only for clear error. *See id.* at 594. A factual determination is clearly erroneous "only if 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Mobil Shipping & Transp. Co. v. Wonsild Liquid Carriers Ltd.*, 190 F.3d 64, 67-68 (2d Cir. 1999) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)). "[T]he fact that there may have been evidence to support an

inference contrary to that drawn by the trial court" is insufficient to demonstrate clear error, *Ceraso v. Motiva Enters., LLC*, 326 F.3d 303, 316 (2d Cir. 2003), as is a conclusion by the reviewing court that it would have reached a different determination had it been considering the evidence as a trier of fact, *Mobil Shipping*, 190 F.3d at 67.

In finding clear error in the Tax Court's determination that Margot Stewart retained full possession or enjoyment of the residence she shared with Brandon as tenant in common, the majority errs in at least two respects. First, the majority misreads the very cases on which its argument principally depends. The majority relies heavily upon cases in which a transferor has conveyed 100% of his or her interest in a property to another family member, most typically a spouse, but then has continued to reside at the property with the transferee until the transferor's death. In such circumstances, I agree that courts have often reasoned that the decedent's "use of the property by occupancy after the transfer is a natural use . . . which grows out of a congenial and happy family relationship," *Estate of Gutchess v. Comm'r*, 46 T.C. 554, 557 (1966), and have concluded as a result that the transferor's continued residence is *not itself alone* sufficient evidence from which to infer an agreement that the transferor would retain possession or enjoyment, as contemplated by section 2036, *see, e.g.*, *Union Planters Nat'l Bank v. United States*, 361 F.2d 662, 666 (6th Cir. 1966) (finding

6

no basis "to impose the tax upon the estate of a husband who has vested the fee simple title to the family residence in his wife, *merely* because he continues to live in the house until his death" (emphasis added)); *Estate of Roemer*, 46 T.C.M. (CCH) 1176, 1178 (1983) (citing cases, and observing that "the courts have uniformly rejected the advocation of section 2036's applicability based on the *mere* fact that the donor continued to live in a residence which he had conveyed . . . ." (emphasis added)).

But whereas courts considering such intrafamily transfers have relied on the compatibility between post-transfer co-occupancy and the existence of a bona fide transfer to conclude that a transferor's continued residence at a property is insufficient evidence, by itself, to *confirm the existence* of an implied agreement favoring the transferor, *see also* 1 Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates and Gifts ¶ 126.6.2 (2009), the majority, conversely, treats co-occupancy post-transfer as sufficient evidence to *prove the absence* of an implied agreement, at least with respect to the residential portion of the property at issue, *see* **[Draft 17, 20]** (observing that in cases where the transferor neither exclusively possessed a property nor excluded the transferee, "taxpayers have *won* in every case," and concluding, on the basis of nothing else, that "Brandon manifestly enjoyed, and decedent did not, the benefits of the residential portion of the 49%."); **[Draft 21]** (indicating that "Brandon received

7

100% of the economic benefit from the residential portion [of his 49% interest] by inhabiting it"). This logic not only departs from that of prior cases, but ignores that the Tax Court here was required to consider "all facts and circumstances surrounding the transfer and subsequent use of the property" in determining the existence or absence of an implied agreement. *Estate of Rapelje*, 73 T.C. at 86.

Next, the majority focuses not on what Margot Stewart retained after the transfer of the 49% share in her townhouse, but rather on what Brandon Stewart supposedly received. This contravenes the plain language of section 2036, which directs that the value of a gross estate shall include "the value of all property . . . of which the decedent has at any time made a transfer . . . under which he has retained for his life . . . the possession or enjoyment of . . . the property . . . ." In other words, under section 2036 we look to whether the facts and circumstances surrounding a transfer evince an agreement that the *transferor's* lifetime possession or enjoyment of the affected property will not be diminished, and if they do, we include the value of the transferred interest in the gross estate. This reading of the statute is confirmed by reference to the statute's original target, the creation by the decedent of a life estate with a remainder given to relatives. In such circumstances, the statute includes the full value of the property in the decedent's gross estate because his lifetime

enjoyment of the property is undiminished – not because, after the transfer, he somehow enjoys the remainder interest given to his relatives. The Tax Court's interpretation of section 2036 in cases involving partial transfers of real estate – where the distinction under discussion is most relevant – is consistent with this understanding of the statute. *See Estate of Wineman v. Comm'r*, 79 T.C.M. (CCH) 2189,2193-94 (2000); *Estate of Powell v. Comm'r*, 63 T.C.M. (CCH) 3192, 3193-94 (1992).

The distinction just highlighted is significant, because neither the formal interest that Brandon Stewart received as a tenant in common nor his (purported) substantial enjoyment of that interest can, as the majority would have it, be dispositive as to Margot Stewart's possession or enjoyment of the residential portion of the Manhattan property. As a tenant in common, Margot Stewart retained the right, even after the transfer, to possess and enjoy the whole of the Manhattan townhouse, subject only to Brandon Stewart's right to do the same. *See, e.g.*, *Jemzura v. Jemzura*, 330 N.E.2d 414, 419 (N.Y. 1975).[1]

[1] Although 26 U.S.C. § 2036(a) does not require that a transferor retain a legally enforceable right to possess or enjoy a property following transfer in order for a court to find that an implied agreement to that effect existed, *see Estate of Maxwell*, 3 F.3d at 593, it is worth noting that courts considering co-occupancy following 100% transfers – the cases upon which the majority so heavily relies – have considered the lack of any continuing right by the transferor to remain on the property to be significant in finding the absence of an implied agreement. *See, e.g.*, *Union Planters Nat'l Bank*, 361 F.2d at 665 (noting that "at any time . . . [the transferee] could have conveyed [the residence property] by her separate deed, without the consent of [the transferor]"); *Stephenson v. United States*, 238 F. Supp.

It was thus wholly possible for her to retain substantially the same possession or enjoyment of the property that she had as the sole owner. This is not to say that a tenancy in common ought to be viewed, by itself, as sufficient evidence of an implied agreement or of the terms of such an agreement. A tenancy in common generally, and co-occupancy specifically, might be inconsistent with the transferor's full possession or enjoyment of the property, whether because the tenancy interferes with the transferor's subsequent desire to sell the property, because the transferee can himself file an action for partition, or simply because the co-tenants' desires for the day-to-day use of an asset like a home are incompatible. *See generally Estate of Powell*, 63 T.C.M. (CCH) at 3193-3. But neither can the mere fact of a tenancy in common with co-occupancy be, as the majority would seem to have it, dispositive to a conclusion that a transferor did not continue to possess or enjoy the entirety of a property.

660, 663 (W.D. Va. 1965) ("It seems clear in Virginia that, under the 1955 deed to her, [the transferee's] ownership of the house was absolute, free and clear of any legal rights of her husband."); *Estate of Spruill v. Comm'r,* 88 T.C. 1197, 1226-27 (1987) ("While [the transferee and his wife] may have assumed that [the transferor] would continue to live in the house after [transferor's wife] died, . . . such an assumption does not rise to the level of an implied agreement that decedent had retained the right to 'possess or enjoy' the homesite. On the contrary, [the transferee] testified that had [the transferor] not been able to get along with [the transferee's wife, the transferor] would have had to leave."). Unlike the transferor of a 100% interest, the transferor of a partial interest that results in a tenancy in common does retain substantial rights with respect to the affected property, and those rights extend, as just indicated, to enjoyment of the entire property. It is thus hardly "bizarre," **[Draft 18]** n.13, to carefully analyze transfers that result in a tenancy in common where section 2036 is concerned.

*Estate of Wineman*, one of the relatively few cases in which courts have considered the estate tax consequences of a fractional real estate transfer resulting in a tenancy in common, supports this conclusion. *See* 79 T.C.M. (CCH) at 2193-94. The court in that case found that no implied agreement existed between the decedent and her children regarding her transfer of a 24% interest in the family homestead, and thus that the 24% was not properly included in her gross estate, even though the decedent had continued to live with her children at the homestead after transfer. *Id.* at 2194. The court, however, emphatically did not rely on the mere fact of a tenancy in common, coupled with co-occupancy among family members, to determine that the children's fractional share was not properly included in the decedent's gross estate. It instead looked at "all facts and circumstances surrounding the transfer and subsequent use of the property," *Id.* at 2193, as longstanding precedent requires. *See, e.g., Estate of Abraham*, 408 F.3d at 39.

The facts of the case showed that the decedent's post-transfer use of the large parcel at issue – which contained, *inter alia*, two residences, two large barns, a small barn, a granary, a farm shop, cattle scales, corrals, two garages, and an orchard – was limited to her own home, the garden, and the small orchard next to her home. *Estate of Wineman*, 79 T.C.M. (CCH) at 2194. Even so, the court noted that "the fact that decedent personally used less than all of

11

the property [after the transfer] does not demonstrate that she did not possess and enjoy the entire property." *Id.* Nor, even, was the fact that someone other than decedent paid the taxes on the property sufficient on its own to demonstrate the absence of an implied agreement. *Id.* Rather, it was only after these and other surrounding circumstances were considered together that the court was willing to conclude that the estate had carried its burden of proving the absence of an implied agreement. Notably, the court relied "heavily" on the credible testimony of one of the transferees that there was no understanding between the decedent and her children. *Id.*

In the present case, there is nothing in the record to indicate that Margot Stewart's use of the Manhattan residence after the transfer was limited in the fashion of the decedent's in *Estate of Wineman*, or that Brandon's presence in any way interfered with Margot's possession or enjoyment of the property. In fact, the estate concedes that Margot and Brandon Stewart amicably shared the residential property after the transfer, just as they had when Margot Stewart was sole owner. *See* Petitioner's Br. at 9 (indicating that after the transfer, "Brandon and Margot lived together amicably as tenants in common, sharing the residential portion of the building"). Given Margot Stewart's receipt of 100% of rent paid on the property, *see Estate of Hendry v. Comm'r*, 62 T.C. 861, 873 (1975) (noting that the actual "retention of income or revenue from the property

12

by the decedent . . . constitutes very clear evidence" of the existence of an implied agreement.); *accord Estate of McNichol v. Comm'r*, 265 F.2d 667, 671 (3d Cir. 1959), the estate here needed to point to *some* facts or circumstances to carry its "particularly onerous" burden of showing the absence of an implied agreement with respect to Margot Stewart's possession or enjoyment of the whole. *See Estate of Maxwell*, 3 F.3d at 594. But the estate made no showing whatsoever that Margot Stewart's use of the residential portion of the townhouse changed appreciably between the many years when Brandon lived with Margot as her houseguest and the final months of her life, when Brandon possessed a formal interest in the property.

Moreover, the Tax Court made other findings of fact that strongly supported its conclusion that Margot Stewart retained possession or enjoyment of the property following her formal transfer of an interest to Brandon. As already mentioned, Margot Stewart received 100% of the income from the rental portion of the Manhattan property, the significance of which the majority attempts to minimize by dividing the property into its rental and residential components, and suggesting that the Tax Court erred by not making separate findings adequate to support a conclusion that the extent of the implied agreement covered the residence. But as the majority acknowledges, determining the scope of an implied agreement is far from an exact science, and

13

the Tax Court here was permitted to draw some inferences in determining the agreement's parameters.  **[Draft 15]**  The majority does not indicate why the Tax Court could not have drawn a strong inference about how Margot and Brandon Stewart viewed their relationship to the residential portion of the Manhattan property from the way they acted with respect to the property's rental income, which belied the estate's contention that a bona fide tenancy in common had been created.  *See Estate of Thompson*, 382 F.3d at 376 ("An implied agreement may be inferred from the circumstances surrounding both the transfer and subsequent use of the property.").

In fact, the significance of the majority's assertion – not to be found in prior case law – that the Tax Court was required to make separate findings regarding the commercial and residential portions of the Manhattan property cannot be overstated.  By subdividing the property in this way, the majority first renders Margot Stewart's receipt of the rental income – or any other evidence regarding the property's so-called "commercial" portion – irrelevant to the determination whether she retained possession or enjoyment of the "residential" portion.  The majority in effect shifts the burden of proving the existence of an implied agreement as to the residential portion to the Commissioner by depriving him of the natural inferences that flow from *all* the facts and circumstances surrounding this transfer – a single transaction which the

14

majority admits included an implied agreement favoring Margot Stewart. The majority next makes it near impossible for the Commissioner to meet his new burden with the astounding claim, relying on cases saying merely that a transferor's continued residence at a property after transfer is not alone sufficient to infer an implied agreement, that such residence "is highly probative of the absence of an implied agreement"! **[Draft 18]**. This analysis makes it hard to conceive of a situation in which the Tax Court might properly find that despite the formal transfer of a fractional interest in property to a cohabitating child, the parent reserved for himself its possession and enjoyment so that the estate should not be permitted to avoid the payment of estate tax on the property's value as a whole.

Properly considering *all* the facts and circumstances, and placing the burden where it belongs, it is abundantly clear that the Tax Court did not err here in holding against the estate. Brandon Stewart's efforts to satisfy the estate's burden of disproving the significance of the rental receipts – via trial testimony in which he explained that he had received none of the Manhattan rent because he and Margot Stewart had agreed to offset the costs and revenues of the Manhattan property against those associated with their East Hampton property – failed for lack of credibility. *See Amalfitano v. Rosenberg*, 533 F.3d 117, 123 (2d Cir. 2008) ("In reviewing findings for clear error, we are not allowed

15

to second-guess either the trial court's credibility assessments or its choice between permissible competing inferences."). The Tax Court's adverse credibility finding, moreover, was supported by the inconsistency between Brandon's testimony and that of his accountant, who indicated that he could not recall Brandon ever having told him of the offset plan. *See Krieger v. Gold Bond Bldg. Prods.*, 863 F.2d 1091, 1098 (2d Cir. 1988) ("[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.") (quoting *Anderson*, 470 U.S. at 575).

Even if additional factual findings were required to support the Tax Court's conclusions with respect to the residential portion of the property – which I dispute – the Tax Court made such findings. As the Tax Court noted, after Margot's transfer of a 49% undivided interest to Brandon, she continued to pay the bulk of the expenses relating to the Manhattan property, contributing $21,790.85 in 2007 while Brandon paid only $1963. *Estate of Stewart*, 92 T.C.M. (CCH) 357, 358 (2006). The majority indicates, on the one hand, that Brandon's payment of this sum without reimbursement was a "significant change[]" in his and Margot Stewart's relationship to the property **[Draft 5]**, implying that it supports the conclusion that Brandon's post-transfer relationship to the property

16

was that of part-owner. At the same time, the majority suggests that Margot's payment of more than her share of the property's expenses *decreased* her net possession or enjoyment of the property, **[Draft 22-23]**. But surely, Brandon's payment of far less than his share of expenses as tenant in common – a bit over 8% of the total expenses, when he was the 49% owner of the property – supports the Tax Court's conclusion that the transfer was *not* one of substance, in that Margot continued to fulfill the bulk of the responsibilities of ownership, notwithstanding Brandon's formal interest.[2] Case law does not support the assertion that a tax court is precluded from finding that the transferor retained

---

[2] The majority indicates that even if its legal analysis of the significance of Brandon Stewart's nominal contributions is flawed, his failure to fulfill the obligations of a tenancy in common still are not sufficiently suggestive of an agreement favoring Margot. **[Draft 19]** n.13 (observing that "a decedent's payment of all or substantially all gross expenses post-transfer has, in many cases, not resulted in a finding of an implied agreement" (citing *Estate of Roemer*, 46 T.C.M. (CCH) at 1177; *Stephenson*, 238 F. Supp. at 663)). But the majority does not dispute the Tax Court's finding that an implied agreement *did exist* with respect to the property at issue in this case, and the majority's citation to cases in which courts have declined to accord much weight to the decedent's post-transfer payment of expenses fails to note either the relative absence of other evidentiary support for an implied agreement in those cases, *see Stephenson*, 238 F. Supp. at 633, or the existence of offsetting evidence in favor of the estate that was significant to the result, *see Estate of Roemer*, 46 T.C.M. (CCH) at 1179 (observing "[t]he evidence in the record clearly demonstrates the change in the decedent's state of mind regarding the residence after giving it to her daughter," and noting that after the transfer, the decedent had referred to her daughter as her "landlord," requested permission before inviting friends to the residence, and expressed a fear of being excluded and sent to a nursing home); *id.* (noting "[the daughter's] actions following the gifting of the residence also changed," pointing to the fact that she, as transferee, had made substantive payments reflective of ownership, and crediting the daughter's testimony that "if there had ever been a falling out . . . [the decedent] would have been the one to have moved").

possession or enjoyment of the entirety of a property when the transferee made only token gestures showing that the transfer had substance, and where only minor changes occurred in the transferor's possession or enjoyment. *See Estate of Thompson*, 382 F.3d at 376 (upholding inclusion of interest in gross estate where the "practical effect of . . . changes [imposed by the transfer] during decedent's life was minimal"); *cf. Estate of Grace*, 395 U.S. at 324 (finding property held in trust includable in gross estate under 26 U.S.C. § 2038 when a reciprocal trust arrangement "leaves the settlors in approximately the same economic position as they would have been in had they created trusts naming themselves as life beneficiaries"); *Estate of Wineman*, 79 T.C.M. (CCH) at 2194 (noting that even payment of *all* property taxes by someone other than transferor is insufficient to show absence of an implied agreement giving transferor possession or enjoyment of the whole). Viewed in its entirety, the history of Margot and Brandon Stewart's relationship to the Manhattan property, and especially the lack of significant, objective changes in that relationship, strongly supports the Tax Court's conclusion that Brandon Stewart remained, in essence, Margot Stewart's houseguest. *A fortiori*, the record does not support a "definite and firm conviction that a mistake has been committed'" by the Tax Court in this case. *Mobil Shipping*, 190 F.3d at 67-68.

The majority purports to stop short of holding that, as a matter of law,

18

post-transfer co-occupancy by the transferor and transferee will always preclude a finding of an implied agreement in favor of the transferor. But given the facts present in this case, it is hard to imagine any evidence – short of an admission at trial by the estate – that would be sufficient to demonstrate the existence of an implied agreement regarding a co-occupied residence. The transferor's retention of all rent from the commercial portion of the very same property is deemed irrelevant as a matter of law to the conclusions a tax court may draw regarding the property's residential portion, notwithstanding the court's obligation to consider all circumstances surrounding the property in assessing the parties' intentions. And a transferee's minimal post-transfer participation in the obligations of a tenancy in common is held, strangely and again as a matter of law, both to aid in establishing the existence of an adverse agreement and to undercut the economic value for estate tax purposes of that which was retained. If the majority's opinion imposes any burden of proof on the estate, much less the onerous one that precedent requires, I cannot see it. Cohabitating family members are all but invited to engage in sham transactions that have no impact upon the transferor's possession and enjoyment of a property, and whose only purpose is tax avoidance. It is not the job of this Court, of course, to close loopholes that Congress has left in the tax code. Here, however, the majority inexplicably reopens a loophole that the legislature has, in unmistakable terms,

19

long since commanded shut.

Evidence demonstrating the existence of a genuine post-transfer tenancy in common certainly could weigh against the conclusion that the transferor and transferee had an implied agreement that the transferor would continue to possess or enjoy the whole of a property. But since in this case there is not only an absence of such evidence, but the record actually shows that the parties to the transfer did not behave as though a tenancy in common had been created and the transferor's relationship to the property did not, in substance, change, I cannot see how it was clear error for the Tax Court to find that the estate failed to carry its burden to disprove the existence of an implied agreement favoring the transferor with regard to *both* the commercial and residential aspects of this Manhattan townhouse. The majority's reasoning, by focusing solely on Brandon Stewart's residence at the townhouse as a tenant in common as dispositive, not only departs from prior case law and contravenes the text of section 2036, but also thoroughly undermines the statute, inviting inequitable disparities among those subject to the estate and gift taxes due to easy dodges by future tax avoiders.

I respectfully dissent.